815 A.2d 563

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Roderick JOHNSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted July 22, 2002.

Decided Dec. 27, 2002.

Reargument Denied Feb. 21, 2003.

Samuel J.B. Angell, Billy Horatio Nolas, Philadelphia, for appellant, Roderick Johnson.

Kelly S. Kline, for appellee, Com. of Pa.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice NEWMAN.

Roderick Andre Johnson (Johnson) appeals from an Order of the Court of Common Pleas of Berks County (PCRA court)

denying his Petition for Post–Conviction Relief pursuant to the Post–Conviction Relief Act [1] (PCRA). For the reasons set forth herein, we affirm the decision of the PCRA court.

## FACTS AND PROCEDURAL HISTORY [2]

The police charged Johnson, along with co-Defendants, Shawn Bridges (Bridges) and Richard "Rambo" Morales (Morales), with the murders of Damon Banks (Damon) and Gregory Banks (Gregory). Based in large part on statements Johnson gave to police, the record indicated that someone robbed the girlfriend of Bridges at gunpoint on December 7, 1996. The robbers indicated that they were looking for drugs and money. They did not find any drugs or money, but they did abscond with a camcorder and Sony Playstation. News of this incident traveled quickly to Bridges, whose girlfriend informed him that the robbers wore green masks and green "hoodies." Bridges recalled seeing Damon and Gregory wearing green "hoodies" earlier that day. Bridges and Johnson went to the home of Morales; while there, Bridges grabbed a shotgun and mentioned that he wanted to go to the home of Damon and Gregory and murder them. Bridges showed Johnson and Morales a 9–millimeter Glock pistol that he had on his person.

The following day, Johnson, Bridges, and Morales went to a local K–Mart© to purchase shotgun shells. Soon thereafter, they traveled in a minivan to the home of Damon and Gregory. While Bridges was in the house talking to Damon and Gregory, Johnson noticed a woman unloading groceries next door. Bridges emerged from the house with Damon and Gregory and stated that he wanted them to take care of drug-selling operations while he was away. Damon and Gregory got into the minivan with Bridges, Johnson, and Morales. The group drove to a dirt road near a car lot and construction site.

1. 42 Pa.C.S. § 9541, *et seq.*

2. The facts recited herein are taken in large part from the March 26, 1999 Opinion of this Court, authored by this Justice, on direct appeal of Johnson's two convictions for first-degree murder. *Commonwealth v. Johnson*, 556 Pa. 216, 727 A.2d 1089 (1999), *cert. denied*, 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000) (*Johnson I*).

Bridges and Morales got out of the van and asked Damon and Gregory to accompany them to the location where the drugs were hidden. When Damon and Gregory refused, Bridges and Morales returned to the van and Bridges separately informed Johnson that he (Bridges) was going to shoot Damon and Gregory on the count of three. According to Johnson, Bridges then walked around to the front of the minivan, where Damon and Gregory were standing, and shouted, "What's on station two and three?" At that point, Bridges started shooting. In his statements to the police, Johnson claimed that Bridges also fired a shot at him, striking Johnson in the side of his torso. Bridges then drove away and Johnson walked approximately two miles to the Queen City Restaurant, where he was subsequently picked up and taken to the hospital for treatment of his gunshot wound.

The Commonwealth tried Johnson separately from Bridges and Morales for the murders of Damon and Gregory. At trial, the Commonwealth presented a crucial piece of evidence contradicting the claim of Johnson that he was not involved as a shooter. The Commonwealth introduced the testimony of a forensic pathologist, who stated that one of the bullets recovered from the body of Damon was a .38 caliber bullet. According to the testimony of the ballistics expert for the Commonwealth, the murder weapon was a .38 caliber handgun; police recovered a .38 caliber handgun close to the scene of the murder. George Robles (Robles), a friend of Johnson who was a witness for the Commonwealth, testified that Johnson possessed a .38 caliber handgun like the one found at the murder scene. Robles also stated at trial that when he visited Johnson in the hospital, Johnson told him that he had taken the handgun with him, had wiped it off with his shirt, and threw it on the side of the road within one-quarter mile of the murder scene. On November 26, 1997, a jury convicted Johnson of two counts of first-degree murder.[3]

During the penalty phase, the Commonwealth presented the testimony of Robles that Johnson was the "enforcer" for the drug operations of Bridges and that the murder occurred in

3. 18 Pa.C.S. § 2502(a).

connection with drug sales, in support of the aggravating circumstance that the murder was committed in connection with drug activity,[4] which the jury unanimously found. The jury found as a mitigating circumstance in the murder of Damon that Johnson had no significant criminal history.[5] The jury determined that the aggravating circumstance outweighed the mitigating circumstance and the court imposed a death sentence accordingly. When determining the sentence to impose on Johnson for the murder of Gregory, the jury found that the mitigating circumstance that Johnson had no significant criminal history was no longer true because Johnson had just killed Damon. "Upon questioning from the judge, the jurors stated that because there was testimony that [Damon] died before [Gregory], [Johnson] would have had a 'criminal history' (i.e. the murder of [Damon]) when [Gregory] was killed." *Johnson I*, 727 A.2d at 1102–1103. Thus, the jury found one aggravating circumstance and no mitigating circumstances, mandating a sentence of death.

On direct appeal, we affirmed the convictions and death sentences imposed on Johnson; the United States Supreme Court denied *certiorari*. On March 19, 2000, then Governor Ridge signed a death warrant for Johnson, whose execution the Commonwealth scheduled for May 11, 2000. On April 11, 2000, Johnson filed a Motion for an Emergency Stay of Execution and a *pro se* Petition for Post–Conviction Relief in the PCRA court. The PCRA court appointed counsel for Johnson, who filed a First Amended PCRA Petition on April 26, 2000. After reviewing the Motion for an Emergency Stay of Execution, the PCRA court refused to grant a stay. The court also denied the request of Johnson to file a Second Amended PCRA Petition. On May 8, 2000, this Court granted Johnson an Emergency Stay of Execution. *Commonwealth v. Johnson*, 561 Pa. 489, 751 A.2d 647 (2000) (*Johnson II*). On July 7, 2000, despite the Order of the PCRA court denying the request of Johnson for leave to file a Second Amended PCRA Petition, counsel for Johnson filed a Supple-

4. 42 Pa.C.S. § 9711(d)(14).

5. 42 Pa.C.S. § 9711(e)(1).

ment to the First Amended PCRA Petition. On August 25, 2000, the PCRA court conducted a hearing to determine whether to amend the First Amended PCRA Petition to include those issues raised in the Supplement to the First Amended PCRA Petition. The court permitted the amendment and gave Johnson forty-five additional days in which to file additional materials in support of his position. On October 10, 2000, counsel for Johnson filed a Second Supplement to the First Amended PCRA Petition. As Johnson presented this document to the court more than forty-five days after the August 25th Order, the PCRA court denied the Second Supplement to the First Amended PCRA Petition on October 12, 2000.

On February 23, 2001, the PCRA court dismissed most of the issues Johnson raised without a hearing and scheduled hearings for the remaining seven contentions. In July of 2001, Johnson again filed a Motion to Supplement the PCRA Petition, constituting his Third Supplement to the First Amended PCRA Petition. This new supplement raised two new issues; the PCRA court denied the motion. The PCRA court conducted hearings on the seven remaining issues on May 11, 2001, and August 2, 2001. By Order dated October 25, 2001, the PCRA court denied the PCRA Petition of Johnson. On November 21, 2001, Johnson filed a Notice of Appeal to this Court pursuant to 42 Pa.C.S. § 9546(d).

## ISSUES [6]

On appeal to this Court from the denial of his PCRA Petition, Johnson raises the following twenty-three allegations of error:

1. Did the Commonwealth present insufficient evidence to establish the aggravating circumstance set forth in 42 Pa. C.S. § 9711(d)(14), in violation of the Sixth, Eighth, and Fourteenth Amendments?

6. We have renumbered the issues presented by Johnson for ease of discussion.

2. Was trial counsel ineffective for failing to adequately move to suppress Johnson's statements to law enforcement authorities?

3. Was Johnson denied a fair trial because counsel did not effectively cross-examine material witness George Robles and because the Commonwealth did not disclose a bail report and other evidence that Robles was paying off police officers, all in violation of Johnson's Sixth, Eighth, and Fourteenth Amendment rights?

4. Under the proper materiality standard, when considering the *Brady* claim regarding the Robles letter, is Johnson entitled to relief and was trial counsel ineffective for failing to get the Robles letter?

5. Was counsel ineffective for failing to request that the trial court dismiss the venire panel when three potential jurors were involved in a conversation about the case with the investigating police officer, in violation of the Sixth, Eighth, and Fourteenth Amendments?

6. Was Johnson denied a fair and impartial jury in violation of his Sixth, Eighth, and Fourteenth Amendment rights where the Berks County jury selection procedure systematically excluded minorities?

7. Was Johnson denied his right to effective assistance of counsel during jury selection in violation of the Sixth, Eighth, and Fourteenth Amendments where trial counsel failed to object to removal for cause, or attempt to rehabilitate, jurors who expressed some reservations about the death penalty?

8. Was Johnson denied a fair trial in violation of the Sixth, Eighth, and Fourteenth Amendments when counsel failed to seek a mistrial when, at trial, the aunt of the decedent was disruptive and crying in the first row of the gallery, right next to the jury box?

9. Was counsel ineffective for presenting an inconsistent defense conceding guilt in violation of the Sixth, Eighth, and Fourteenth Amendments?

10. Was trial counsel ineffective for failing to investigate and raise a diminished capacity defense?

11. Was trial counsel ineffective for failing to call witness Iris Alvarez to testify regarding Commonwealth witness George Robles?

12. Was counsel ineffective for failing to object when the trial court gave an improper instruction on accomplice liability, in violation of Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments?

13. Did counsel's failure to employ a ballistics expert constitute ineffective assistance?

14. Was trial counsel ineffective for failing to investigate, develop, and present relevant mitigating evidence of Johnson's good conduct during incarceration?

15. Was counsel ineffective for failing to seek a proper jury instruction that the jury was bound by the stipulation of the parties and for failing to raise on appeal that the jury improperly rejected the 42 Pa.C.S. § 9711(e)(1) "no significant history of prior criminal convictions" mitigating circumstance in violation of the Sixth, Eighth, and Fourteenth Amendments?

16. Was trial counsel ineffective for failing to investigate substantial mitigating evidence that was readily available, to present that evidence to the jury, and to argue numerous mitigating factors as a basis to spare Johnson's life, in violation of the Sixth, Eighth, and Fourteenth Amendments?

17. Was counsel ineffective for failing to object to the trial court sending out written instructions with the jury during the sentencing phase, which error was compounded because the instructions erroneously denied Johnson the presumption of life?

18. Was counsel ineffective for failing to object to the trial court's jury instruction, for failing to request an *Enmund v. Florida* instruction at the sentencing stage, and for not raising the issue on appeal, in violation of Johnson's Sixth, Eighth, and Fourteenth Amendment rights?

19. Was trial counsel ineffective for failing to properly investigate the evidence of the 42 Pa.C.S. § 9711(d)(14) aggravator, and for failing to request, during the sentencing phase, an adequate period of time to investigate a police report requested before trial but received during trial?

20. Did the prosecutor engage in misconduct where he repeatedly asked about Johnson's alleged failure to show remorse and, after this occurred, was counsel ineffective for failing to seek a curative instruction and/or a mistrial and for failing to raise the issue on appeal?

21. Is Johnson entitled to a new sentencing hearing because the trial court failed to properly instruct the jury on the nature and use of aggravating and mitigating factors, in violation of the Sixth, Eighth, and Fourteenth Amendments?

22. Was counsel ineffective for failing to move to bar the 42 Pa.C.S. § 9711(d)(14) aggravator as unconstitutionally vague, overbroad, and arbitrary, and for failing to object to the aggravator on these grounds and to raise the error on appeal, in violation of Johnson's Sixth, Eighth, and Fourteenth Amendment rights?

23. Was counsel ineffective for not seeking an instruction that Johnson would be ineligible for parole, did the trial court err in not providing such an instruction, and was counsel ineffective for failing to raise the error on appeal, in violation of the Sixth, Eighth, and Fourteenth Amendments?

## DISCUSSION

### Previously Litigated Claims

As a preliminary matter, Johnson's first two allegations of error—insufficiency of the 42 Pa.C.S. § 9711(d)(14) aggravating circumstance (claim 1) and ineffectiveness of counsel for failing to "adequately" move to suppress statements Johnson made to law enforcement authorities from December 8, 1996, through December 12, 1996 (claim 2)—have been previously litigated. Section 9544(a)(2), 42 Pa.C.S.

§ 9544(a)(2), provides that an issue has been previously litigated if the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.] As part of the independent review of the Record that this Court conducted in the direct appeal of Johnson's conviction and death sentence, we specifically addressed the sufficiency of the (d)(14) (murder committed in conjunction with drug activity) aggravating circumstance and found the evidence of that aggravator to be sufficient. *Johnson I,* 556 Pa. 216, 727 A.2d 1089, 1102–1103. Additionally, on direct review we rejected the arguments of Johnson that the trial court erred in failing to suppress the December 1996 statements of Johnson.[7] *Id.* at 1098–1099. For this reason, these issues are not appropriate for collateral review.

### *Commonwealth Witness Robles*

Johnson raises four distinct claims stemming from the testimony of Commonwealth witness Robles. Johnson contends that: (1) the Commonwealth committed a *Brady* violation by failing to disclose a bail report and other evidence that Robles paid off police; (2) trial counsel was ineffective for failing to effectively cross-examine Robles; (3) this Court used the incorrect materiality standard for determining whether the Commonwealth violated *Brady* by not turning over a letter in which Robles stated that he would do anything to get out of jail; and (4) trial counsel was ineffective for failing to procure the Robles letter. To demonstrate ineffective assistance of counsel, one must show: (1) that the [underlying] claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and, (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball,* 555 Pa. 299,

7. On direct appeal we rejected the underlying substance of the claim of Johnson—he raises it here as a claim of ineffective assistance of counsel, but as one of the prerequisites for finding ineffective assistance of counsel we need to find that the underlying claim has arguable merit. Because there is no underlying claim with arguable merit, no further inquiry is necessary.

724 A.2d 326, 333 (1999). Counsel will not be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649 (2001).

 Regarding the first sub-issue, failure to disclose the bail report and other evidence that Robles paid off the police, this evidence is not material. It is well settled that a *Brady* violation exists only where the prosecution failed to disclose material evidence that deprived the defendant of a fair trial. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different . . . . A reasonable probability [is a probability sufficient to] undermine confidence in the outcome." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotations and citations omitted). Johnson cites to a bail report on Robles, that Johnson contends could have helped him impeach Robles. According to Johnson, the report states that his bail is conditioned upon his appearance at court proceedings, reporting any changes of address, and undergoing drug testing and counseling. We fail to see how this report, if it had been disclosed to Johnson, would have changed the result of the proceeding. In his question to this Court, Johnson refers to other evidence that the police paid off Robles, but he does not cite to any such evidence in his argument. Johnson also posits that trial counsel was ineffective for failing to cross-examine Robles in this regard, but the Record indicates otherwise. Attorney Adams specifically asked Robles the following question: "They gave you bail because you agreed to testify, is that correct?" Trial N.T., 11/20/97, page 523. Robles responded: "No, they gave me bail because I met whatever requirements I needed to make bail." *Id.* We refuse to find counsel ineffective because he did pursue this argument.

 The other two allegations of Johnson in this regard stem from this Court's discussion of the Robles letter on

direct appeal, wherein we stated that it was not material pursuant to *Brady.* Johnson correctly notes that we did not employ the proper standard for analyzing his claim. In *Johnson I*, we stated that where a defendant makes "a general request for exculpatory evidence, then the evidence is considered material only if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Johnson I*, 727 A.2d at 1094. However, the Supreme Court has abolished the distinction between general and specific discovery requests and now determines materiality by questioning whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433, 115 S.Ct. 1555. As it relates to the facts of this case, the difference between the two standards does not come into play in the case *sub judice* and, therefore, Johnson did not suffer any prejudice as a result of our error. Likewise, as we have determined that Johnson has failed to meet his burden of proving materiality pursuant to *Brady,* he cannot establish the requisite prejudice to succeed on a claim of ineffective assistance of counsel.

### *Venire Panel Members' Conversation with Police Officer*

Johnson next contends that trial counsel was ineffective for failing to request that the trial court dismiss the venire panel when three potential jurors had an impermissible conversation with Lieutenant Dunn, the investigating police officer. During voir dire, Lieutenant Dunn described the conversation as follows:

> Lieutenant Dunn: I was talking with Children and Youth, one of their investigators from the case I'm working, and she asked me how the jury selection was going. I said, it's slow. And she said, how's Mr. Johnson. I said, he's cleaned up his act. And one of the jurors said, oh, did we have to buy that suit? And I turned around, and there she was standing. She said, he looks nice in that suit, I guess we have to pay for it. And there was an older gentleman standing there. She said to me, are you an attorney? And

he said, no, he's the Chief of Police from Exeter. So that's what was said.

The Court: Well, where did this occur?

Lieutenant Dunn: In the smoke—at the back of the building where they smoke, where people stand outside and smoke, in that little doorway.

The Court: In the services center?

Lieutenant Dunn: Yes, the Services Center. I believe they weren't picked yet.

The Court: All right. There were two then?

Lieutenant Dunn: Two females and a male.

The Court: Two females and a male. Three people.

Lieutenant Dunn: I said to them, don't talk to me. And the other female said, well, these people would do anything to get off the jury, something to that effect.

Notes of Testimony (N.T.), Voir Dire, 11/13/97, pages 300–301. The trial court identified the two female jurors and questioned them on the Record; both indicated that they had not told anyone else about the conversation. N.T. Voir Dire, 11/13/97, pages 420–429. The court excused both potential jurors from the venire panel. Lieutenant Dunn was never able to identify the male whom he had observed, though both females thought that he may have been a venire person.

██ Johnson makes allegations that this male may have spoken with other jurors about the conversation; however, the PCRA court correctly notes that he has given "no indication other than the wildest speculation that this unknown man may have somehow tainted the jury." Opinion of the PCRA Court, February 23, 2001, page 18. Clearly this conjecture does not establish any prejudice suffered by Johnson. "Absent a demonstration of prejudice, [a PCRA petitioner] cannot prevail on a claim for ineffective assistance of counsel and no further inquiry into the claim is warranted." *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 221 (2001) (citing *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261 (2000), *cert. denied*, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000)).

*Alleged Racial Bias of Berks County*
*Jury Selection Procedure*

■ Johnson next alleges that he was denied a fair and impartial jury because the jury selection procedure utilized in Berks County has a racial bias, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. To establish a violation of the requirement that the pool of prospective jurors is a fair representation of the community, "a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this under[-]representation is due to systematic exclusion of the group in the jury selection process." *Commonwealth v. Craver,* 547 Pa. 17, 688 A.2d 691, 696 (1997), *cert. denied,* 522 U.S. 834, 118 S.Ct. 104, 139 L.Ed.2d 58 (1997) (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). " 'Systematic' means caused by or inherent in the system by which juries were selected." *Id.* (quoting *Duren,* 439 U.S. at 366–367, 99 S.Ct. 664).

Specifically, Johnson complains that Berks County's use of driver's registration lists as the basis for the jury pool has the effect of systematically excluding minorities. In *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859 (2000), *cert. denied,* 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002), the same Bridges involved in the case *sub judice,* we rejected a similar claim that a jury pool compiled from voter registration lists systematically excluded minorities. In *Bridges,* we stated that "a criminal defendant may not attack the racial composition of jury panels drawn from voter registration lists on the theory that blacks are underrepresented in voter lists because such computer generated lists are compiled without regard to race." *Id.* at 868 (quoting *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929, 933 (1990), *cert. denied,* 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991)) (internal quotation omitted); *see also Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 114 (1998), *cert. denied,* 528 U.S. 810, 120 S.Ct. 41,

145 L.Ed.2d 38 (1999); *Commonwealth v. Ronald Jones*, 465 Pa. 473, 350 A.2d 862, 866 (1976). Likewise, driver's license lists are compiled without regard to race. Other than a bald statement that "[c]ustomarily African Americans and Hispanics have been inadequately represented in driver's license registration lists[,]" (Brief of Johnson, page 73) Johnson makes no argument that the method used to select drivers is inherently biased. Absent some showing that driver's license selection procedures are inherently biased, Johnson has failed to distinguish jury pool lists derived from voter registration records from those derived from driver's license registration lists. Accordingly, Johnson has failed to establish a constitutional violation.

### *Alleged Failure to Rehabilitate Jurors Who Expressed Opposition to Death Penalty*

 Johnson next asserts that trial counsel was ineffective for failing to attempt to rehabilitate jurors who expressed opposition to the death penalty. Specifically, Johnson objects to the alleged failure of counsel to rehabilitate eleven jurors, each of whom the trial court struck for cause. During either general questioning or individual voir dire, each of the eleven jurors stated that they had beliefs that would prevent him or her from imposing the death penalty. It is well settled that "whenever a juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath, he is properly excluded from the jury." *Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 48 (1997) (citing *Commonwealth v. Jasper*, 531 Pa. 1, 610 A.2d 949, 952–53 (1992)) (internal quotation omitted). Additionally, "[i]t is within the trial court's discretion to strike a juror for cause, and such a decision will not be disturbed absent a showing of abuse of discretion." *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 442 (1999) (citing *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996)).

The PCRA court reviewed the voir dire record and found it unlikely that counsel could have rehabilitated any of the eleven

jurors. We have conducted an independent review of the transcripts and agree. Moreover, the PCRA court, which also sat as the original trial court, stated that, "had trial counsel failed to agree to striking each of these jurors for cause, we would have struck them from the panel, as is our discretion to do. Therefore, it would have been futile for counsel to have attempted to rehabilitate these jurors." Opinion of the PCRA Court, February 23, 2001, page 24. Accordingly, we find no error in the decision of counsel to not attempt to rehabilitate these jurors.

### Alleged Failure to Seek a Mistrial Due to Allegedly Disruptive Behavior

Johnson next avers that trial counsel rendered ineffective assistance by failing to move for a mistrial when Eugenia Banks (Eugenia), the aunt of the victims, began crying in the courtroom. According to the PCRA court, "[t]his incident arose early on in the guilt phase of trial when [Eugenia] was observed to be crying with her head down in the gallery near the jury box. At this time a sidebar was held in which the matter was discussed and it was ultimately resolved to move [Eugenia] away from the vicinity of the jury." Opinion of the PCRA Court, February 23, 2001, page 14 (citing N.T. Guilt Phase, 11/18/97, pages 169–170). "Mistrials should be granted only when an incident is of such a nature that its unavoidable effect is to deprive appellant of a fair trial." *Commonwealth v. Lewis*, 523 Pa. 466, 567 A.2d 1376, 1383 (1989) (internal quotation omitted) (citing *Commonwealth v. Chestnut*, 511 Pa. 169, 512 A.2d 603, 606 (1986)). We cannot say that this incident, which was quickly ameliorated by moving Eugenia, had the unavoidable effect of depriving Johnson of a fair trial. As the PCRA court aptly notes, "as this is a homicide case, we would trust that every juror with even the merest scintilla of common sense would realize that there are likely to be grieving relatives for the victims." Opinion of the PCRA Court, February 23, 2001, page 15. As there is no merit to Johnson's contention that he was entitled to a mistrial as a result of this incident, counsel was not

ineffective for failing to request one. *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649 (2001) (counsel will not be deemed ineffective for failing to raise a meritless claim).

## Allegedly Inconsistent Defense Strategy

 Johnson avers that counsel was ineffective for presenting a defense that conceded his guilt. Johnson fails to realize, however, that his several statements to police in December of 1996 severely constrained the avenues of defense left viable for counsel to pursue. In these statements to police, Johnson conceded that he knew Bridges planned to murder Damon and Gregory and that he drove Bridges, Damon, and Gregory to the location of the murders. Trial counsel could not pretend that these statements did not exist, as the jury would consider them. The only credible defense for counsel to present was one in which Johnson admitted the above-recited participation. Counsel chose to submit that it was Bridges, not Johnson, whose girlfriend was the victim of the robbery and that Bridges, not Johnson, had a motive to kill Damon and Gregory. Counsel also argued that Bridges shot Johnson before shooting Damon or Gregory and that Johnson fled the scene immediately, before Bridges fired at Damon or Gregory.

In this manner, counsel admitted that Johnson was present at the scene, but argued that Johnson was not an accomplice because he stopped facilitating commission of the crimes prior to Bridges' act of shooting Damon and Gregory. Additionally, counsel presented evidence that Bridges fled the county, while Johnson stayed and met with police, to mitigate the culpability of Johnson. While this strategy ultimately did not succeed, given the evidence against Johnson, it was nonetheless one of the very few arguments that counsel could have reasonably made to the jury. Accordingly, we find that counsel had a reasonable basis for conceding Johnson's presence at the scene and some degree of complicity and, thus, counsel was not ineffective in this regard. *See Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 454 (1995) (where "the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective").

*Alleged Failure to Raise a Diminished Capacity Defense*

Johnson next argues that trial counsel was ineffective for failing to present a diminished capacity defense. Johnson avers that there was significant evidence that he suffered from mental health and cognitive impairments that prevented him from forming the requisite intent necessary for the commission of first-degree murder. At the PCRA hearing, Johnson presented the testimony of two mental health experts on this point. Dr. Carol Armstrong (Dr. Armstrong), a neuropsychologist, testified that Johnson suffered from right brain hemisphere dysfunction encompassing multiple neurocognitive domains, including memory, perception, and reasoning. Dr. Armstrong opined that these impairments surfaced during the childhood of Johnson and remained through his adolescence. N.T. PCRA, 5/11/01, pages 6–22. Dr. Armstrong testified that Johnson suffered from an impairment in judgment and reasoning that was present at the time of the murder; she further stated that the impairment "probably would have been greater because [Johnson] was drinking and taking drugs at the time and was in a complex situation." N.T. PCRA, 5/11/01, page 25. When asked by PCRA counsel for Johnson if these mental problems impaired the ability of Johnson to appreciate the criminality of his conduct, Dr. Armstrong replied that they did "because . . . they caused him to act without thinking. He has poor control of his mental thoughts. If you put him under stress, inebriate him and give him drugs, he's going to act with even less forethought." *Id.* at 36.

At the PCRA hearing, Johnson also presented the testimony of Dr. Julie B. Kessel (Dr. Kessel), a psychiatrist, who stated that Johnson suffered from depression, organic mental symptom with baseline brain impairments ("[p]eople with baseline brain dysfunction tend to have a harder time judging reality, not saying over inadvertently out of touch with reality, but they tend to respond to interpret reality"), substance abuse and alcohol dependency, and attention deficit disorder. *Id.* at 57–60. Dr. Kessel agreed with Dr. Armstrong that Johnson suffered from these impairments at the time of the shooting of Damon and Gregory and that these problems

substantially impaired the ability of Johnson to appreciate the criminality of his conduct. *Id.* at 62–64.

At the PCRA hearing, when questioned by the Commonwealth, trial counsel [8] testified as follows:

Q: Mr. Adams, with regard to the discussion that you had with diminished capacity, did you ever consider a diminished capacity defense?

A: No.

Q: I believe it was, in fact, your testimony that your client was merely interested in beating the charges; isn't that correct?

A: Yes. And he—after—we discussed the plea agreement on a number of occasions, but he would not accept it. He wanted to take his chance and try to beat it.

Q: And, in fact, with regard to a diminished capacity defense, isn't it true that you have to admit your culpability in your defense and merely show that he didn't have the specific intent to commit first degree murder; is that correct?

A: I think that is a fair statement.

*Id.* at 156–157. Attorney Miller testified consistently, stating that "the case in chief during the guilt phase was that [Johnson] was a follower and that [Bridges] was acting in retaliation for what happened to [his girlfriend], that being the robbery by the Bankses .... After all, we said Bridges shot [Johnson]." *Id.* at 185.

We have held that "[a] defense of diminished capacity is only available to a defendant who admits criminal liability but contests the degree of guilt." *Commonwealth v. Laird,* 555 Pa. 629, 726 A.2d 346, 353 (1999) (citing *Commonwealth v. Weaver,* 500 Pa. 439, 457 A.2d 505 (1983)). In *Weaver,* counsel for Weaver had presented, without the consent of Weaver, a

8. Johnson was represented by two attorneys at trial, Mr. Adams and Mr. Miller. Mr. Adams served as primary counsel and took the lead during the guilt phase; Mr. Miller assumed responsibilities primarily during the penalty phase. N.T. PCRA 5/11/01, page 158. Unless otherwise indicated, references to trial counsel indicate Attorney Adams.

diminished capacity defense, even though Weaver insisted that someone else had committed the murder for which he was on trial. A jury convicted Weaver of first-degree murder and related crimes and the Court of Common Pleas of Tioga County sentenced Weaver to life imprisonment. Weaver filed a direct appeal to this Court.[9] We determined that counsel for Weaver presented the only viable defense but, nonetheless, we vacated the Judgment of Sentence imposed by the Court of Common Pleas of Tioga County, finding that the authority to present a defense of diminished capacity, thereby conceding general criminal liability, is solely within the province of the accused. *Weaver*, 457 A.2d at 506.

"[C]ounsel's strategic decision to seek acquittal rather than pursue a diminished capacity defense does not constitute ineffective assistance if there is a reasonable basis for the strategy chosen." *Commonwealth v. James Jones*, 539 Pa. 222, 651 A.2d 1101, 1109 (1994), *cert. denied*, 516 U.S. 835, 116 S.Ct. 113, 133 L.Ed.2d 65 (1995). Johnson maintained throughout the trial that Bridges, not he, had shot Damon and Gregory; Johnson even contended that Bridges had shot Johnson. Absent an admission from Johnson that he had been the one to shoot Damon and Gregory, trial counsel could not have presented a diminished capacity defense. Thus, we cannot say that trial counsel did not have a reasonable strategic basis for rejecting such a tactic. Consequently, trial counsel was not ineffective for failing to present diminished capacity evidence. *See Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 454 (1995) (where "the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective").

### Alleged Failure to Call Witness Iris Alvarez

Johnson next posits that trial counsel was ineffective for failing to call Iris Alvarez (Alvarez) to refute the testimony

9. At the time of Weaver's conviction, the statute detailing the direct appellate jurisdiction of this Court, 42 Pa.C.S. § 722, provided that "[t]he Supreme Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in the following classes of cases: (1) [f]elonious homicide . . . ." Repealed by Act of 1980, No. 137.

of Robles, who testified that he visited Johnson at Reading Hospital and heard Johnson confess to participating in the murders of Damon and Gregory. To succeed on a claim of ineffective assistance of counsel for failure to present witnesses, a defendant must establish: "(1) the witnesses existed; (2) the witnesses were available; (3) that counsel was informed of the existence of the witnesses or should have known of the witnesses' existence; (4) that the witnesses were available and prepared to cooperate and would have testified on [the defendant's] behalf; and (5) the absence of the testimony prejudiced the [defendant]." *Commonwealth v. Crawley,* 541 Pa. 408, 663 A.2d 676, 679–680 (1995), *cert. denied,* 517 U.S. 1212, 116 S.Ct. 1832, 134 L.Ed.2d 936 (1996).

At the PCRA hearing, Alvarez testified that she was a former girlfriend of Johnson and a cousin of Robles. She told the PCRA court that, at the time Robles visited Johnson, Johnson had tubes in his mouth and could barely speak. She stated that Robles was never alone with Johnson at the hospital and that she never heard Johnson say anything about the shooting other than to state that Bridges shot him. N.T. PCRA, 5/11/01, pages 88–95. Alvarez admitted that she was subpoenaed to testify at the trial of Johnson, but stated that she told trial counsel that she could not attend because she was one-and-one-half months pregnant at the time and experiencing abdominal pains. Alvarez claimed at the PCRA hearing that she informed trial counsel that she could testify if the trial was postponed until after she gave birth.

In direct contradistinction to these statements, trial counsel testified at the PCRA hearing that Alvarez was uncooperative and "refused to come down [to Pennsylvania from Connecticut] and testify." *Id.* at 117. Trial counsel did not recall Alvarez asking him to request a continuance so that she could testify after she gave birth. Moreover, trial counsel testified that during his conversations with Alvarez in advance of the trial of Johnson, Alvarez never told him that she was always in the room with Robles and Johnson. Attorney Miller gave testimony consistent with that of trial counsel, stating that Alvarez told him that she did not have any interest in John-

son's situation. *Id.* at 180–181. The PCRA court, which had the opportunity to observe the demeanor of the witnesses, credited the testimony of trial counsel and Attorney Miller over the testimony of Alvarez. The PCRA court concluded that Alvarez "simply refused to cooperate in any respect . . . ." Opinion of the PCRA Court, October 10, 2001, page 19. Thus, we find that Johnson has failed to meet his burden of establishing that Alvarez was available and prepared to cooperate and testify on behalf of Johnson.

### Alleged Failure to Object to Accomplice Liability Instruction

Johnson avers that trial counsel was ineffective for failing to object to the trial court's jury instruction on accomplice liability; specifically, he asserts that the instruction allowed the jury to believe that he could be convicted of first-degree murder if Bridges possessed specific intent to kill, even if Johnson did not. The court read the following instruction to the jury:

> You may find the defendant guilty of a crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the defendant was an accomplice of the person who committed it. It does not matter whether the person you believe committed the crime has not been prosecuted or convicted. What is important, I think, is the analysis of whether or not the defendant is an accomplice or was an accomplice of anyone, first, you must remember my instructions and definition as to the offenses. The different offenses. You must decide whether or not anyone committed murder of the first degree or murder of the third degree, or aggravated assault, either type. If you decide that one or more of those offenses have been proven beyond a reasonable doubt by the Commonwealth, you decide who, in fact, committed one or more of these offenses, then you must decided if you have not decided the defendant actually committed it, but if you decided that he did not commit it, but was acting as an accomplice, then you must look at that

language of accomplice liability. **Did the defendant have the same intent when he acted in aiding or agreeing to aid or attempting to aid the person who actually committed it?**

The Commonwealth must prove, if you find that there was a murder of the first degree, **that the defendant, as an accomplice, had the same mental state, the same intent to kill as the actual killer, the specific intent to kill, for first degree murder.** And he aided—agreed to aid or attempted to aid the other person in planning or committing it.

N.T. Trial, 11/25/97, pages 832–833 (emphasis added).

 When reviewing a challenge to a jury instruction, we must review the charge as a whole. *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1290 (2000); *see Commonwealth v. Gilbert Jones*, 546 Pa. 161, 683 A.2d 1181 (1996). An instruction will be upheld if it clearly, adequately and accurately reflects the law. The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law. *Spotz*, 759 A.2d at 1287. A trial court has broad discretion in phrasing its instructions and is permitted to choose its own wording. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998). The above-quoted instruction, when read as a whole, clearly indicated to the jury that, to find Johnson guilty of murder in the first degree, they needed to find that he possessed the requisite specific intent to kill, even if they determined that he was not the person who actually pulled the trigger. Therefore, the jury charge was not erroneous and counsel will not be deemed ineffective for failing to raise a meritless claim. *Tilley, supra.*

### Alleged Failure to Employ a Ballistics Expert

 Johnson posits that trial counsel rendered ineffective assistance by failing to obtain a ballistics expert to examine the bullets recovered from the crime scene, the vehicle driven by Bridges, and the body of Johnson. The Commonwealth

presented the testimony of ballistics expert State Trooper Kurt Tempinski (Trooper Tempinski) at the trial of Johnson; Johnson asserts that trial counsel was ineffective for failing to have an expert employed by the defense examine the bullets. However, Johnson merely makes bald assertions that: (1) it is "reasonably likely such evidence would have aided the defense[;]" (2) there was no reasonable basis for the omission of trial counsel; and (3) Johnson suffered prejudice as a result. Brief of Johnson, page 75. Johnson fails to contend that the conclusions of Trooper Tempinski were in any way incorrect and fails to support his contention that a ballistics expert employed by the defense would have uncovered evidence that would have aided the defense; thus, he has failed to meet his burden of proving that the underlying claim has arguable merit.

### Alleged Failure to Present Evidence of Good Conduct During Incarceration

Johnson also alleges that trial counsel was ineffective for failing to present to the jury evidence of his good behavior while in prison awaiting trial as a mitigating circumstance pursuant to 42 Pa.C.S. § 9711(e)(8) (the catchall mitigator). However, the PCRA transcript clearly indicates that Johnson never informed trial counsel or Attorney Adams that such evidence existed. See PCRA N.T., 5/11/01, page 149 ("We were never made aware by him that he had an outstanding prison record, and I am not aware of his prison record"). Trial counsel did not present this evidence to the jury because Johnson himself never made his defense team aware of his good prison conduct or the existence of witnesses to that effect. We refuse to deem trial counsel ineffective for failing to present mitigation evidence that he did not know existed.

### Allegedly Improper Rejection of (e)(1) Mitigator

Johnson finds error with the decision of the jury to reject the (e)(1) mitigating circumstance with respect to the murder of Gregory; he raises the claim as one of ineffective assistance of counsel for failing to seek an instruction that the

jury was bound by the stipulation of the parties. During the penalty phase, the Commonwealth and Johnson stipulated to the fact that Johnson had no significant history of prior criminal convictions. As discussed above, the jury found the existence of the (e)(1) mitigator (no significant history of prior criminal convictions) with respect to the murder of Damon, but rejected this mitigating circumstance when determining the sentence for the death of Gregory. The jurors each indicated that they made this determination based upon the medical testimony that Damon died before Gregory. Johnson now submits that trial counsel erred by failing to raise on direct appeal to this Court that the jury improperly rejected the (e)(1) mitigating circumstance with respect to the murder of Gregory.

Johnson cites to our decision in *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069 (2001), for the proposition that a jury is bound by the stipulation of the defendant and the Commonwealth to the existence of any mitigating circumstances. In that case, the parties stipulated that the defendant did not have a previous criminal record. The jury rejected the (e)(1) mitigating circumstance and sentenced the defendant to death. We reversed, holding that "where a mitigating circumstance is presented to the jury by stipulation, the jury is required by law to find that mitigating factor." *Id.* at 1089. Thus, we expressly overruled *Commonwealth v. Copenhefer*, 526 Pa. 555, 587 A.2d 1353 (1991), in which we had held that a jury was free to refuse to find the (e)(1) mitigating circumstance even when the parties stipulated that the defendant did not have a prior criminal record.

As a preliminary note, at the time of the sentencing phase of Johnson, on November 26, 1997, *Copenhefer* was the law of this Commonwealth. As we have held on myriad previous occasions, counsel will not be deemed ineffective for failing to divine a change in the law. *See, e.g., Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 653 (2001) (citing *Commonwealth v. Fowler*, 550 Pa. 152, 703 A.2d 1027 (1997)). On a more substantive basis, this case is clearly distinguishable from *Rizzuto*. In *Rizzuto*, the jury convicted the defendant of

one murder, which the parties stipulated at the penalty phase was his first criminal conviction. In the case *sub judice,* the jury convicted Johnson of two separate murders. During the penalty phase, the trial court instructed the jurors that they would be rendering two separate verdicts, one with respect to Damon and the other with respect to Gregory. Sentencing N.T. 11/26/97, page 1031. Prior to the trial in this case, Johnson had no significant history of criminal convictions, which the jury found as a mitigating circumstance in the death of Damon. However, given the evidence that Gregory died after Damon, the jury found that the (e)(1) mitigator no longer existed. Johnson and the Commonwealth did not stipulate to the existence of the (e)(1) mitigator as to both murders; rather they agreed that at the beginning of the proceedings Johnson did not have a significant criminal past. *Rizzuto* mandates that the jury find the (e)(1) mitigator with respect to the first murder, but the jury was well within its bounds to reject the (e)(1) mitigator with respect to the second murder.

## *Alleged Failure to Present Mitigation Evidence*

 Johnson contends that trial counsel was ineffective for failing to conduct a reasonable investigation of his life history, mental health, drug and alcohol abuse, and other avenues of mitigation. At the PCRA hearing, trial counsel testified that he obtained a detailed family history, prepared by the sister of Johnson, school records, and medical records. However, neither Johnson nor his family provided any information about alleged suicide attempts or head trauma that Johnson now alleges he suffered. Trial counsel stated at the PCRA hearing that Johnson did not show any signs of mental infirmity or an inability to communicate. PCRA N.T., 5/11/01, page 198. Trial counsel testified that "[Johnson] said that [drug and alcohol abuse] was not an issue. There wasn't a degree of alcohol [and] he was not under the influence of a controlled substance. That is why that particular issue was not pursued." *Id.* at 183. Trial counsel also stated that he did not present much evidence on drug and alcohol abuse in mitigation as "one of the [Commonwealth's] aggravating factors was, to

paraphrase, homicide during the course of a drug transaction involving drug activity." *Id.* at 184. It was reasonable for trial counsel to attempt to avoid portraying Johnson as someone heavily involved in the drug scene, which could have the effect of solidifying in the minds of the jurors the existence of the (d)(14) drug activity aggravator.

Our review of the original sentencing phase transcript indicates that trial counsel presented the evidence that he gleaned from his communications with the family of Johnson and Johnson himself. The only avenues of mitigation that the family or Johnson advised trial counsel of prior to the penalty phase were: (1) Johnson's age at the time of the murders; (2) his drug and alcohol abuse; and (3) his troubled family household. Trial counsel sought as a mitigating circumstance the age of Johnson. Counsel did present some evidence of Johnson's drug and alcohol abuse and, as discussed above, had a reasonable basis for not presenting more. Counsel also introduced the testimony of the family members of Johnson to show that he came from a family with problems and that they had high expectations of him. As the PCRA court correctly found, "[u]nder the facts and circumstances of this case, trial counsel cannot be held ineffective for what he did not know and was not made aware of by [Johnson] or his family." Opinion of the PCRA Court, October 2, 2001, page 22. Counsel conducted a reasonably thorough review and sought relevant information for the penalty phase. He presented his findings in a manner reasonably designed to highlight the positives of Johnson without bringing too much attention to the negatives. Any deficiencies in the presentation of counsel stem not from his performance as counsel, but from Johnson's own failure to advise.

### Alleged Failure to Object to Written Instructions

Johnson also alleges that trial counsel was ineffective for failing to object to the decision of the trial court to send written instructions with the jury into deliberations. The written instructions were designed to assist the jury in completing the somewhat complicated verdict forms and did not

contain any statements on points of law. Johnson cites to three cases of this Court to establish that a court commits reversible error when it gives written instructions to a jury. *Commonwealth v. Karaffa*, 551 Pa. 173, 709 A.2d 887 (1998); *Commonwealth v. DeHart*, 539 Pa. 5, 650 A.2d 38 (1994); *Commonwealth v. Oleynik*, 524 Pa. 41, 568 A.2d 1238 (1990). Johnson relies on the following language from *Oleynik:*

> Where a jury is permitted to take with them written instructions during their deliberations, a question may arise as to the appropriate application of the written instruction when resolving an issue in the cause [sic]. In such a case, it is highly probable the jury would resort to its interpretation of the written instructions in reaching its verdict. Where the jury is required to rely upon the oral instructions given by the judge in his charge, if disagreement arises concerning the oral instructions, it is more likely that the jury would seek further instructions from the judge to resolve the question. When an issue is resolved by further instructions from the court, that procedure insures that misconceptions are not permitted to infect the deliberative process. On the other hand, when a jury is left to its own devices to interpret a written instruction, the possibility of a misconception is significantly enhanced. Moreover, the submission of written instructions would tend to encourage the jury to ignore the court's general instruction and focus upon the written instructions supplied to them. This undue emphasis on portions of the charge has the potential of undermining the integrity of the deliberative process.

*Oleynik*, 568 A.2d at 1241.

In *Oleynik*, the court sent out with the jury written instructions on the definitions of legal causation, third-degree murder, and involuntary manslaughter. That situation is obviously distinguishable from the present case, where the instructions did not contain an articulation of points of law, but merely explained to the jury how to fill out the verdict slip. In *DeHart*, the court gave to the jury a written instruction that itself misstated the law. That error is in a different class from the error alleged herein. In *Karaffa*, similar to

*Oleynik,* the court provided the jury with written instructions on the definitions of unlawful restraint and reasonable doubt. These errors clearly and directly implicate the concerns we addressed in *Oleynik;* the written "instructions" in the case *sub judice* do not. Written directions to the jury detailing the procedure for filling out a verdict slip are not subject to interpretations that could potentially prejudice a defendant. For this reason, we refuse to find that trial counsel was ineffective for failing to object to the written instructions.

### Alleged Failure to Request an Enmund v. Florida Instruction

Johnson next faults trial counsel for failing to request an instruction during the penalty phase, pursuant to *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that an accomplice to a murder cannot be sentenced to death absent proof that he intended to take life or contemplated that life would be taken in the process. During the penalty phase, the trial court instructed the jury as follows:

> With regard to Damon Banks, there is one (1) aggravating circumstance that may be considered by you. That is, that at the time of the killing, Damon Banks was or had been involved, associated, or in competition with the defendant in the sale, distribution, or delivery of any controlled substance, and the defendant committed the killing or was an accomplice to the killing, and the killing resulted from or was related to that association, involvement or competition, to promote the defendant's activities in selling, distributing or delivering controlled substances.

> Since I have used the term "accomplice" again, and I, in no way can ask you what your verdicts were predicated upon yesterday, the Commonwealth needs to prove that the defendant killed or was an accomplice and cannot rely upon conspiracy liability for this aggravated circumstance. Therefore, I will briefly again tell you an accomplice is—the defendant is an accomplice of someone else if with the intent of promotion, or facilitating the commission of the crime, he solicits, commands, encourages, or requests the other per-

son to commit it, or aids, agrees to aid, or attempts to aid the other person in planning or committing it.

Sentencing N.T., 11/26/97, page 1033. We see nothing improper with this instruction as it clearly, adequately, and accurately reflects the law. *Spotz, supra,* 759 A.2d at 1287. Moreover, as we discussed above, the jury instruction on accomplice liability during the guilt phase was correct. As the jury had already determined that Johnson possessed the requisite intent to kill to support a finding of first-degree murder, the instruction was superfluous. In *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1385 (1991), *cert. denied sub nom Laird v. Pennsylvania,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) *(Chester I),* we held that by virtue of a jury finding a defendant guilty of first-degree murder based on a proper guilt phase accomplice liability instruction, as a matter of law, the defendant possessed the minimum culpability required under *Enmund* and its progeny. Accordingly, this issue does not present an avenue by which Johnson could obtain relief, as counsel will not be deemed ineffective for failing to raise a claim that is devoid of arguable merit.

### Alleged Failure to Investigate Aggravating Factor and Request a Continuance

Johnson asserts that trial counsel was ineffective for failing to adequately investigate a police report that detailed Robles' knowledge of the drug activities of Johnson that supported the (d)(14) drug involvement aggravating circumstance and for failing to request an adequate continuance to prepare a cross-examination of Robles. Johnson raised much of this contention on direct appeal of his conviction and death sentence. We addressed the claim at that time as follows:

Two days before the penalty phase of [Johnson's] trial was to begin, the Commonwealth disclosed to [Johnson's] counsel the existence of a police report that described statements Robles made regarding [Johnson's] participation in Shawn Bridges' drug activities. The Commonwealth produced a copy of this report to [Johnson's] counsel the day before the penalty phase was to begin. At the commence-

ment of the penalty phase, [Johnson] sought to preclude the Commonwealth from introducing any evidence concerning the aggravating circumstance found at 42 Pa.C.S. § 9711(d)(14)—that the murder occurred in connection with illegal drug trafficking—as a sanction for the Commonwealth's late production of the report. The trial court denied [Johnson's] request, noting that the Commonwealth had produced the report and that [Johnson] had been on notice that the Commonwealth was seeking the death penalty on the basis of this aggravating circumstance. [Johnson] now claims that the Commonwealth engaged in misconduct by failing to produce this police report when [Johnson] made his general discovery requests nine months before trial.

We find no violation of *Brady* here, and there was no error made by the trial court denying [Johnson's] request to preclude the Commonwealth from presenting evidence of the relationship between the murders and [Johnson's] drug dealing activities. The Commonwealth produced the police report before the penalty phase of [Johnson's] trial. The basis for [Johnson's] complaint, therefore, is that the Commonwealth failed to comply in a timely fashion with his discovery request for statements of all witnesses that the Commonwealth intended to call at the sentencing phase, and that he was prejudiced by this late production of the report. In evaluating this claim, we must look at: (1) whether the discovery rules were violated; and (2) whether the trial court abused its discretion in not excluding evidence pursuant to Rule 305(E) of the Pennsylvania Rules of Civil Procedure. The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. Moreover, a defendant seeking relief from a discovery violation must demonstrate prejudice. The production of statements made by the witnesses of the Commonwealth is within the discretion of the trial court. In refusing to grant [Johnson's] request that the Commonwealth be precluded from introducing any evidence regarding the aggravating circumstance of Section 9711(d)(14), the trial court found that the

Commonwealth had disclosed—several months before the trial—that it planned on calling Robles during the penalty phase. Further, the trial court noted that [Johnson's] investigator had interviewed Robles on previous occasions and had the opportunity to question Robles about his knowledge of [Johnson's] involvement in Bridges' drug activities, if he chose to do so. The trial court granted [Johnson] some relief by granting him a half-hour continuance to prepare for cross examination of Robles on the basis of this police report, and found this adequate in light of the advanced notice that [Johnson] had of the subject matter of Robles' testimony at the penalty phase. According to these circumstances, we find no abuse of the discretion of the trial court in refusing [Johnson's] request for further relief.

*Johnson,* 727 A.2d at 1096–1097 (internal footnote and citations omitted). To the extent that this claim is not previously litigated, it still does not entitle Johnson to any relief as Johnson has failed to articulate what additional investigation or a longer continuance might have uncovered. Thus, Johnson has not met his burden of proving prejudice and, accordingly, his claim of ineffective assistance of counsel fails. *Commonwealth v. Pierce,* 567 Pa. 186, 786 A.2d 203, 221 (2001) (citing *Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261 (2000), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000)).

### Alleged Prosecutorial Misconduct

 Johnson contends that trial counsel was ineffective for failing to seek a curative instruction or a mistrial when the prosecutor mentioned his lack of remorse during the penalty phase; he also raises this claim as one of prosecutorial misconduct. Johnson points to the following comments of the prosecutor as error:

Detective Bailey, on direct examination by [Attorney] Miller, he asked you to describe the events in the course of the two statements, the written statement from December 11th, 1996, and then your follow-up on December 12th, and he asked you if he was cooperative, and you said, yes.

[Johnson], in the course of those two statements, at any time did he show remorse for his actions—

\* \* \*

[To Sergeant Godshall] In the course of this first statement on December 11th of 1996, at any time did [Johnson] show you remorse for his actions?

Sentencing N.T. 11/26/97, pages 973, 980. Trial counsel objected to both comments and the trial court sustained the objections.

■ It is well settled that "brief comments regarding a defendant's remorse—particularly when ... in response to a defendant's self-centered display of emotion—do not constitute misconduct." *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 449 (1999) (citing *Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 784 (1998), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 451 (1998), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998)). While the comments of the prosecutor in the case *sub judice* were not made in response to a "self-centered display of emotion" by Johnson, nonetheless, the statements are of the ilk contemplated by this Court in *Rollins.* Trial counsel objected to the statements and the court sustained the objections. As the Commonwealth and PCRA court point out, had trial counsel requested a curative instruction, that action would have brought the lack of remorse of Johnson more into the cognizance of the jury. Requesting a mistrial would have been fruitless, as the trial court would not have granted it for such minimal comments. The trial court instructed the jury to disregard matters to which objections were sustained. N.T. Trial, 11/18/97, pages 22–23. "The law presumes that the jury will follow the instructions of the court." *Commonwealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 971 (2001); *Commonwealth v. O'Hannon,* 557 Pa. 256, 732 A.2d 1193, 1196 (1999) ("[a]bsent evidence to the contrary, the jury is presumed to have followed the trial court's instructions"). Hence, trial counsel did not render ineffective assistance in this regard. The underlying claim of prosecutorial misconduct is waived be-

cause trial counsel did not seek a curative instruction or a mistrial at the time of the comment and did not raise the issue on direct appeal to this Court.

*Nature and Use of Aggravating and Mitigating Circumstances Instruction*

 Johnson next asserts that trial counsel was ineffective for failing to object to the trial court's jury instruction on the nature and use of mitigating circumstances.[10] The instruction about which Johnson complains was as follows:

> The sentence you impose will depend on whether you find any of the things that the Pennsylvania Sentencing Code calls aggravating or mitigating circumstances. Loosely speaking, aggravating circumstances are things about the killing and the killer which make a first degree murder case more terrible and deserving of the death penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of death.

Sentencing N.T. 11/26/97, page 909. Johnson maintains that this instruction "impermissibly diverted the focus of the jury's life or death deliberation from a reasoned determination as to [Johnson's] personal culpability, to an amorphous and unguided consideration of how terrible 'the case' was." Brief of Johnson, page 86. We addressed this exact claim in *Commonwealth v. Stevens*, 559 Pa. 171, 739 A.2d 507 (1999). We discussed and rejected the contention in *Stevens* as follows:

> Appellant claims that previous counsel was ineffective for not challenging the instruction of the trial court concerning the purpose of aggravating and mitigating circumstances in capital cases. Specifically, Appellant complains that the following portion of the instruction of the trial court interfered with the determination of the jury of Appellant's personal moral culpability for these murders: "[t]he Sentencing Code

10. In the Questions Presented section of his brief to this Court, Johnson raises this claim as one of trial court error; however, in the text of his argument, he contends that trial counsel was ineffective for failing to object to the instruction. We cannot address the alleged trial court error as that contention is waived; we will, however, address the stewardship of counsel in this regard.

defines aggravating and mitigating circumstances. There [sic] are things that make a first degree murder case either more terrible or less terrible." According to Appellant, the use of the word "terrible," in conjunction with the use of the word "case," improperly distracted the jury from consideration of Appellant's mitigation evidence by drawing their attention to a generalized conception of the 'case.'

When reviewing a challenge to a part of a jury instruction, an appellate court must review the jury charge as a whole to determine if it is fair and complete. A trial court has broad discretion in phrasing its charge and can choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Appellant ignores an earlier instruction by the trial court regarding the function of aggravating and mitigating circumstances, where the court stated:

> Now, the sentence that you impose will depend on whether you find any of the things that the Pennsylvania Sentencing Code calls aggravating or mitigating circumstances. Loosely speaking, aggravating circumstances are things about the killing and the killer which make a first degree murder case more terrible and deserving of the death penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of the death penalty.

We do not find that the instructions of the trial court, as a whole, interfered with the jury's evaluation of the specific mitigation evidence presented by Appellant or their assessment of his personal moral culpability. These instructions merely expressed to the jury, in laymen's terms, the purpose for the distinction between aggravating and mitigating circumstances in a capital penalty phase.

*Id.* at 526–527 (internal citations omitted). Therefore, trial counsel in the case *sub judice* was not ineffective for failing to object to the jury instruction.

*Constitutionality of the (d)(14) Drug Activity Aggravator*

■ Johnson's penultimate argument is that the (d)(14) aggravating circumstance is unconstitutional and that trial

counsel was ineffective for failing to raise this issue at trial or on appeal. 42 Pa.C.S. § 9711(d)(14) includes as an aggravating circumstance that:

> At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

Johnson posits that the words "involved," "associated," and "competition" are unconstitutionally vague and that the aggravating circumstance *in toto* is unconstitutionally overbroad "because it could apply to any murder in a drug saturated urban setting in which the perpetrator or victim are involved with drugs." Brief of Johnson, page 88.

The Supreme Court of the United States has held that, "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (citing *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). The statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (internal quotations and footnotes omitted). An aggravating circumstance is unconstitutionally vague if it "fails adequately to inform juries what they must find to

impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)." *Maynard v. Cartwright,* 486 U.S. 356, 361–362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). "*Furman* held that Georgia's then-standardless capital punishment statute was being applied in an arbitrary and capricious manner; there was no principled means provided to distinguish those that received the penalty from those that did not." *Id.* at 362, 108 S.Ct. 1853. In the context of a challenge to the breadth of an aggravator, to survive an Eighth Amendment challenge "[a]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

The (d)(14) aggravating circumstance is not constitutionally void for vagueness. Johnson's vagueness challenge fails because the aggravator adequately informs the jury that they must find that the victim was or had been involved, associated, or in competition with the defendant in the sale, manufacture, distribution, or delivery of any controlled substance and that the killing occurred in relation to that involvement, association, or competition to promote the activities of the defendant in the sale, manufacture, distribution, or delivery of controlled substances. "Involved," "associated," and "competition" are words of common usage and meaning and do not require additional definition. This aggravator does not leave the jury with unfettered or open-ended discretion to arbitrarily impose the death penalty.

Likewise, the (d)(14) aggravating circumstance is not overbroad. It clearly both "genuinely narrow[s] the class of persons eligible for the death penalty" and "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103 S.Ct. 2733. The aggravator requires a relationship between the defendant and the victim where they

either act in concert or are competitors in the illicit drug market and that the killing occurred to promote the activities of the defendant over the victim in that market, whether the defendant was the actual killer or an accomplice. To consider this an aggravating circumstance that could, by itself, justify the imposition of a capital sentence, is consistent with the public policy of this Commonwealth, which reasonably seeks to reduce the harmful effects that drugs have on our society. Thus, Johnson has failed to meet his burden of proving that his claim that the (d)(14) aggravator is unconstitutional has arguable merit and, accordingly, counsel was not ineffective for failing to raise this issue.

### Life Means Life Instruction

The final allegation of error of Johnson is that trial counsel rendered ineffective assistance by failing to request a jury instruction that a life sentence in Pennsylvania means life without the possibility of parole in accordance with *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In *Simmons*, the Supreme Court of the United States held that a state "may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Id.* at 171, 114 S.Ct. 2187. The Court determined that due process requires that the defendant is entitled to inform the jury that he is ineligible for parole **where the state puts the future dangerousness of the defendant into issue.** *Id.* (emphasis added). As we stated in *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859 (2000), *cert. denied*, 535 U.S. 2306, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002), "[t]his issue has been before this Court numerous times. The law of this Commonwealth is that a *Simmons* instruction is required to be given only in those cases where the future dangerousness of the defendant is placed at issue." [11] *Id.* at 881 (citing

11. We also noted in *Bridges* that "[a] minority of this Court is of the view that a *Simmons* instruction should be given, prospectively, in all capital cases." *Id.* at 881, n. 20 (citing *Commonwealth v. Clark*, 551 Pa.

*Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242, 1257 (1999) (*Chester II*)). A review of the Record shows that the Commonwealth did not put the future dangerousness of Johnson into issue and, thus, there was no need for a *Simmons* "life means life without parole" instruction. Counsel will not be deemed ineffective for failing to raise a claim that has no merit. *Tilley.*

## CONCLUSION

We affirm the decision of the PCRA court to deny the Petition of Johnson. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court of Pennsylvania to transmit the complete record of this case to the Governor of Pennsylvania.

Justice SAYLOR files a concurring opinion in which Justice NIGRO joins.

Justice EAKIN files a concurring and dissenting opinion, joined by Justice CASTILLE, who also joins the majority opinion.

Justice SAYLOR, concurring.

I concur in the result, but write separately to note my disagreement with several aspects of the majority's analysis.

First, in Argument 15 (as renumbered by the majority), Appellant challenges the jury's rejection of the stipulated mitigating circumstance that Appellant had no significant history of prior convictions. *See* 42 Pa.C.S. § 9711(e)(1). The majority rejects this claim based upon the observation that the controlling principles as stated in *Commonwealth v. Copenhefer,* 526 Pa. 555, 587 A.2d 1353 (1991), had not yet been modified by this Court's subsequent decision in *Commonwealth v. Rizzuto,* 566 Pa. 40, 777 A.2d 1069 (2001).

Nevertheless, as an alternate basis for denying relief, the majority distinguishes *Rizzuto,* noting that there was only one

258, 710 A.2d 31 (1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999)).

murder at issue in that case, whereas the present matter involves a double homicide. This distinction is relevant, according to the majority, because the stipulation here at issue should only be viewed as pertaining to the victim that died first.[1] Thus, as there was evidence that victim Gregory Banks died second, the jury acted within its discretion in rejecting the agreed-upon mitigator as to him. *See* Majority Opinion, at 582.

In *Rizzuto*, this Court held that, "where a mitigating circumstance is presented to the jury by stipulation, the jury is required by law to find that mitigating factor." Such conclusion was based upon the observations that Pennsylvania's capital sentencing scheme affirmatively requires a sentencing jury to find the existence of any proven mitigators, and that a stipulation acts as the legal equivalent of the requisite degree of proof. *See id.* at 72–74, 777 A.2d at 1088–89. Accordingly, the Court indicated that, upon stipulation, the existence of the mitigating factor becomes " 'law of the case,' " *id.* at 73, 777 A.2d at 1088 (quoting *Parsonese v. Midland Nat'l Ins. Co.*, 550 Pa. 423, 426, 706 A.2d 814, 815 (1998)), and the jury lacks discretion to refuse to find it:

> If we would grant the jury discretion to ignore stipulations of fact, we would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion. Such a conclusion would undercut the very purpose of the death penalty sentencing scheme developed by our General Assembly.

*Rizzuto*, 566 Pa. at 74, 777 A.2d at 1089.[2]

The majority now re-opens an avenue for the jury to reconsider, and reject, stipulated facts. Such position cannot, in my view, be reconciled with the strictures of *Rizzuto*. Accordingly, I would deny relief solely upon the basis that

1. Neither party contends that the stipulation, by its terms, contemplates any such restriction.

2. *Cf.* Pennsylvania Suggested Standard Criminal Jury Instruction 3.17 ("When the district attorney and counsel for the defendant stipulate, that is when they agree, that a certain fact is true[,] their stipulation is evidence of that fact. *You should regard the stipulated or agreed fact as proven.*" (emphasis added)).

counsel was not ineffective for failure to anticipate the modification of *Copenhefer.*

Additionally, although the majority does not address it, there is another substantial aspect to Argument 15. In particular, Appellant avers that, even apart from any stipulation of the parties, the trial court erred by polling the jury as to why it rejected the Section 9711(e)(1) mitigator relative to Gregory, and then accepting its explanation that such rejection was due to evidence that Gregory died after victim Damon Banks. In this regard, Appellant asserts that the mitigating circumstance, by its terms, only applies to prior "convictions," and that there is no dispute concerning the absence of such convictions regardless of which victim died first. Appellant contends that the jury "erred" by refusing to consider such mitigating evidence based upon the erroneous premise that the order of death of the two murder victims is determinative. He maintains that the trial court also erred when, after polling the jury and learning of its erroneous basis for rejecting the Section 9711(e)(1) mitigator with regard to Gregory, it failed to instruct the jury that the presence of this mitigator is independent of the order of death.

Whatever merit this underlying claim of trial error may have, it is waived and can only be presented in the context of an assertion of ineffective assistance. In his PCRA petition and in his brief to this Court, Appellant only asserts counsel's ineffectiveness in the form of a boilerplate statement attached to the underlying claim of error, stating in a conclusory manner that all prior counsel were ineffective for failing to raise the error. As such undeveloped claims of prior counsel's ineffectiveness are insufficient to satisfy the PCRA's proof requirement, *see Commonwealth v. Bond,* 572 Pa. 588, 600, 819 A.2d 33, 39–40, 2002 WL 1958492, at *4 (Pa., Aug. 23, 2002), Appellant is not entitled to a new sentencing hearing based upon this claim.[3]

---

**3.** Although I concurred in the result in *Bond* and expressed reservations concerning the rubric employed by the majority to reject Bond's ineffectiveness claims, I recognize that, as the lead opinion in that case garnered the votes of a majority of this Court, I am bound by principles

Finally, in disposing of Argument 17, the majority states that "[w]ritten directions to the jury detailing the procedure for completing a verdict slip are not subject to interpretations that could potentially prejudice a defendant." Majority Opinion, at 584. As I am unaware of any reason why it would be impossible for such jury instructions to contain harmful ambiguities, I cannot agree with the majority's statement in this regard. *Cf. Commonwealth v. DeHart*, 539 Pa. 5, 25, 650 A.2d 38, 48 (1994) (vacating a death sentence where the verdict slip contained language that the jurors could have construed to require them to weigh the aggravators against each mitigator individually rather than all mitigators collectively). The challenged portion of the instruction sheet directed as follows:

IF YOU [sic] SENTENCE IS LIFE IMPRISONMENT, YOU SHOULD CHECK THE FINDING, C.1. OR C.2., WHICH EXPLAINS WHY YOUR JURY REJECTS THE DEATH PENALTY AND IMPOSES A LIFE SENTENCE. IF THE REASON FOR REJECTING THE DEATH PENALTY IS THAT ONE OR MORE JURORS FIND NO AGGRAVATING CIRCUMSTANCES, THEN CHECK C.1. IF THE REASON FOR REJECTING DEATH IS THAT, ALTHOUGH ALL JURORS AGREE ON AT LEAST ONE AGGRAVATING CIRCUMSTANCE, ONE OR MORE JURORS FIND THAT MITIGATING ARE NOT OUTWEIGHED BY AGGRAVATING CIRCUMSTANCES, THEN CHECK C.2.

*See* Order and Notice of Intent to Dismiss, dated February 23, 2001, at Exhibit A. Appellant claims that, by suggesting that the jury must "reject" the death penalty to sentence him to

of *stare decisis* to follow it. I read *Bond* as directing that claims of trial counsel ineffectiveness must be developed according to the factors identified in *Commonwealth v. Pierce*, 515 Pa. 153, 158–59, 527 A.2d 973, 975–76 (1987), although, presently, pursuant to *Commonwealth v. Williams*, 566 Pa. 553, 567, 782 A.2d 517, 525 (2001), the Court still affords some latitude concerning claims involving ineffectiveness of direct appellate counsel. *See Commonwealth v. Wharton*, 571 Pa. 85, 109, 811 A.2d 978, 992 (2002) (Saylor, J., concurring) (recognizing that, "where a post-conviction petitioner obtained new counsel for purposes of direct appeal, the Court has not yet retreated from its expressed decision to afford a degree of latitude relative to layered claims of ineffectiveness").

life, these instructions could have been understood to raise a presumption in favor of death, thereby improperly shifting the burden of persuasion to him.

According to Pennsylvania's capital sentencing scheme, certain conditions must be met for death to be imposed, and, barring such conditions, the sentence defaults to life imprisonment.[4] While this paradigm may be described in various different ways, the language employed by the challenged instruction sheet, whereby life is imposed if death is "rejected," sufficiently comports with the statutory procedure. Notably, as well, by indicating that, where even one juror concludes that "mitigating are not outweighed by aggravating circumstances," the instructions clarify that, where the mitigating and aggravating factors weigh equally, a sentence of life must be imposed. Accordingly, Appellant has not demonstrated that use of the instruction sheet prejudiced him.

Justice NIGRO joins this concurring opinion.

Justice EAKIN, concurring and dissenting.

I agree with the majority's conclusion that appellant is not entitled to Post–Conviction relief, but write separately in order to express my view concerning "layered ineffectiveness" claims raised under the PCRA.

Appellant raises 23 issues, all of which pertain to trial error and trial counsel's ineffectiveness. As I noted in my dissent in this Court's recent decision in *Commonwealth v. Ford*, 570 Pa. 378, 809 A.2d 325 (Pa.2002), failure to raise an issue at trial waives the right to raise that issue on appeal; however, if trial counsel's failure to raise the issue is *proven* under the standard in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *Commonwealth v.*

4. The jury must sentence the defendant to death if it
 unanimously finds at least one aggravating circumstance as specified in subsection (d) and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.
 42 Pa.C.S. § 9711(c)(1)(iv). The trial court so instructed the jury. *See* N.T. 11/26/97 at 1031–32.

*[Charles] Pierce*, 515 Pa. 153, 527 A.2d 973, 975–76 (1987), and 42 Pa.C.S. § 9543(a)(4), then relief may be afforded on direct appeal. If, on direct appeal, appellate counsel fails to allege trial counsel's ineffectiveness, then that issue is waived; yet this second waiver can also be overcome by alleging, in a PCRA petition, appellate counsel's ineffectiveness for failing to challenge trial counsel's stewardship. However, appellate counsel's ineffectiveness in this vein must be *proven*, not *assumed*, in order for a petitioner to be entitled to post conviction relief.

Here, appellate counsel's ineffectiveness is only mentioned in issues 18, 20, 22, and 23,[1] and appellant's brief recites appellate counsel's ineffectiveness in a boilerplate paragraph preceding the argument section. *See* Appellant's Brief, at 8–9. Appellant argues the merits of the underlying issues at the trial level, but does not develop the latter two prongs of the *Strickland* test with respect to appellate counsel's ineffectiveness: lack of a reasonable basis for the omission of the issue, and resulting prejudice.

As I stated in *Ford*, appellate counsel's stewardship must be appraised with the same consideration given trial counsel. *See Ford*, at 414 (Eakin, J., dissenting). Strategic choices not to advance an issue at trial are not unreasonable *per se* simply because the defendant was found guilty; likewise, appellate counsel's decision to forego advancing an issue concerning trial counsel's stewardship should not be held ineffective *per se* simply because trial counsel's decision may have been unreasonable. *Id.* Proof is required, and a paragraph simply alleging ineffectiveness of every attorney from trial to date is not sufficient under *Strickland*.

Unlike the appellant in *Ford*, appellant's PCRA petition was litigated after the abolition of "relaxed waiver" in PCRA capital appeals in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 700 (1998); therefore, he was required to plead *and prove* each prong of the ineffectiveness test with respect to appellate counsel. Having failed to do so, he is not entitled to

1. As renumbered in the majority opinion.

a remand for a hearing, and no relief is due. Accordingly, although the majority addresses appellant's issues on their merits and concludes they are meritless, I would hold appellant has not sufficiently demonstrated appellate counsel's ineffectiveness for failing to challenge trial counsel's stewardship, and would deny relief on this basis.

Therefore, I dissent from the analysis of my learned colleagues.

Justice CASTILLE joins this concurring and dissenting opinion.