J-A21006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JUSTIN RANSOME | : | |
| | : | |
| Appellant | : | No. 3467 EDA 2018 |

Appeal from the Judgment of Sentence Entered June 21, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002099-2017

BEFORE: BOWES, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:                    Filed: March 23, 2020

Justin Ransome appeals from his June 21, 2018 judgment of sentence after a jury found him guilty of first-degree murder and possessing an instrument of crime ("PIC"). We affirm.

The trial court offered the following summary of the facts of this case:

> In the course of a romantic relationship with Kerrianne Parrish, [Appellant] moved into her home at 2274 East Cambria Street, in Philadelphia. Her brother, decedent Kole Parrish [("victim")], also lived in Kerrianne Parrish's home. On February 18, 2017, at approximately 1:46 a.m., inside the above residence, [Appellant] got into a heated argument with [victim]. While in the kitchen, the verbal argument escalated into a physical altercation between the men. During the ensuing fight, [Appellant] pulled a knife from the breast pocket of his coat and stabbed [victim] twenty-one times.
>
> At approximately 2:00 a.m. that morning [Appellant] texted his girlfriend, Kerrianne Parrish, and stated that he had "had enough" of [victim]. Alarmed, Ms. Parrish left her place of employment and rushed home, she observed [Appellant] leaving the crime scene, and that her home was in complete disarray. She

discovered [victim] lying on his stomach in the kitchen, motionless, and covered in his own blood. Ms. Parrish then called 911 for emergency assistance. The paramedics arrived and pronounced [victim] dead at the scene. Ms. Parrish gave police officers a statement, and identified her boyfriend, [Appellant], as the person who fatally stabbed her brother, [victim].

An autopsy was performed by Dr. Sam Gulino, Chief Medical Examiner for the City of Philadelphia. He concluded to a reasonable degree of medical certainty, that the cause of death was multiple stab wounds, and the manner of death was homicide. [Victim] sustained twenty-one (21) stab wounds to his torso that included injuries to his back, lungs, heart, liver and small intestines, associated with excessive bleeding into his chest and abdominal cavities. [Victim] also sustained stab wounds to his left thigh and multiple "defensive wounds" to his hands and forearms. Evidence was recovered from the crime scene and later analyzed in the Office of Forensic Science. The evidence collected at the crime scene positively matched the DNA profiles of [Appellant and victim], respectively. The fatal injuries [victim] sustained were consistent with the knife used and owned by [Appellant].

Trial Court Opinion, 1/23/19, at 2-3 (citations omitted).

Appellant was arrested less than a block from the scene, carrying a knife with the victim's blood on it. *See* N.T. Jury Trial, 6/19/18, at 198-99. Appellant was charged with the aforementioned crimes, waived his *Miranda*[1] rights, and gave a videotaped statement to police. *See* N.T. Jury Trial, 6/20/18, at 32-33, 93. In his statement, Appellant admitted to stabbing the victim multiple times, but claimed that he did so in self-defense after the victim attacked him. *Id*. at 33. The police took photographs of Appellant's face, torso, hands, and neck which depicted minor injuries. *See* N.T. Jury Trial, 6/19/18, at 133-34. Appellant also told police that he did not call 911

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

and did not care if the victim was alive after the stabbing. *See* N.T. Jury Trial, 6/20/18, at 30, 89.

On June 18, 2018, Appellant proceeded to a jury trial at which Appellant testified and again stated that he acted in self-defense after the victim attacked him. On June 21, 2018, a jury convicted Appellant of first-degree murder and PIC. The trial court immediately proceeded to sentencing, imposing a mandatory term of life imprisonment without the possibility of parole at the murder charge and a concurrent two and one-half to five years of incarceration at the possession of an instrument of crime conviction. Appellant filed a timely post-sentence motion and, on August 21, 2018, filed a supplemental post-sentence motion. The trial court denied Appellant's post-sentence motion on October 18, 2018.

Appellant filed a timely notice of appeal and complied with the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court issued its Rule 1925(a) opinion.

On appeal, Appellant raises the following issues for our review:

1. In a self-defense matter, did the Commonwealth violate ***Brady v. Maryland***, 373 U.S. 83 (1963) and its progeny, by failing to disclose [victim's] record of domestic violence convictions, outstanding arrest warrant, and court ordered anger management counseling and an exculpatory photograph depicting injuries far more severe than the injuries available in discovery and shown to the jury at trial?

2. Did the trial court err in permitting the Commonwealth to admit improper character evidence in the form of a catalog photograph which pictured a knife and referenced a fight,

- 3 -

where the photograph was highly prejudicial, and no foundation was laid relating to the photograph?

3. Did the court err by cutting off [Appellant's] testimony about the [victim's] history of violent behavior and making violent comments, to prevent "bashing" the [victim]?

4. Was the evidence legally insufficient to refute a claim of self-defense where the Commonwealth improperly relied on the number of wounds sustained by [victim], without establishing which wound would have ended the conflict, and relief instead on simply attacking [Appellant's] credibility?

Appellant's brief at 2-3.

Appellant's first issue implicates two potential violations under **Brady v. Maryland**, 373 U.S. 83 (1963). First, Appellant alleges that the Commonwealth should have provided him with the victim's criminal record from Washington, D.C. Second, Appellant argues that the Commonwealth improperly withheld a photograph of Appellant's injuries. We take each issue in turn.

The legal principles that guide our review in this context have been articulated by our Supreme Court:

There are three components of a true **Brady** violation: [t]he evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

**Commonwealth v. Natividad**, 200 A.3d 11, 25 (Pa. 2019) (quoting **Strickler v. Greene**, 527 U.S. 263, 281-82 (1999)). The evidence at issue must have been "material evidence that deprived the defendant of a fair trial."

- 4 -

*Commonwealth v. Johnson*, 815 A.2d 563, 573 (Pa. 2002). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Importantly, the burden rests with Appellant to prove that the Commonwealth withheld or suppressed favorable evidence. *Commonwealth v. Spotz*, 18 A.3d 244, 276 (Pa. 2011). There is no *Brady* violation "when the defendant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources." *Commonwealth v. Paddy*, 800 A.2d 294, 305 (Pa. 2002). This is because "*Brady* sets forth a limited duty, not a general rule of discovery for criminal cases." *Commonwealth v. Rooney*, 79 A.3d 595, 608 (Pa. 2013). Additionally, "[a] reviewing court is not to review the evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record." *Commonwealth v. Dennis*, 17 A.3d 297, 309 (Pa. 2011) (citing *Commonwealth v. Small*, 741 A.2d 666, 675–76 (Pa. 1999)). The factual background pertinent to this claim is as follows.

According to the docket sheets attached to Appellant's supplemental post-sentence motion, victim was convicted of violating a Civil Protection Order ("CPO"), and sentenced on October 17, 2014 to a six-month suspended

sentence followed by a one-year term of probation, during which time he would undergo anger management classes and have no contact with the mother of his child about anything other than the health and welfare of their child. *See* Supplemental Post-Sentence Motion, 8/21/18, at Exhibit C. On May 26, 2015, victim pled guilty to a second charge for violating a CPO. *See* Supplemental Post-Sentence Motion, 8/21/18, at Exhibit D. The second case resulted in a ten-day jail term followed by two years of probation. *Id*. After victim failed to appear for a probation revocation hearing, a bench warrant was issued for his arrest on January 22, 2016. *Id*. Appellant alleges that the Commonwealth had a duty to turn over the victim's criminal record in D.C. prior to trial.

The Commonwealth, on the other hand, contends that Appellant has failed to prove that the Commonwealth possessed the information, that it was not equally accessible to him, or explained how the victim's actions in the prior case were similar in nature and not too distant in time to be admissible at trial. *See* Commonwealth's brief at 15, 17. We agree.

Appellant has not alleged or proven, as he is required to do, that the D.C. criminal dockets were in the Commonwealth's possession, let alone in their exclusive possession. *See Commonwealth v. Carson*, 913 A.2d 220, 244-45 (Pa. 2006) (explaining that the Commonwealth is only responsible for turning over exculpatory or impeachment evidence from its own files or the police files of the government bringing the prosecution). This failure alone is

- 6 -

fatal to his ***Brady*** claim. ***See Commonwealth v. Tharp***, 101 A.3d 736, 752 (Pa. 2014) (finding that the Commonwealth does not violate ***Brady*** when it does not disclose a criminal record that the accused could have obtained); ***see also Commonwealth v. Brown***, 872 A.2d 1139, 1148 (Pa. 2005) (reiterating that the Commonwealth does not infringe on ***Brady*** by not turning over a victim's criminal history, which is equally accessible to the defense).

Additionally, Appellant's allegation that he was unaware that the victim had a criminal record in D.C., so that he could not have discovered this information sooner, appears disingenuous. At trial, Appellant testified that the victim "told him that he had some problems with [his] child's mother, did something in DC and wasn't allowed to go back." N.T. Jury Trial, 6/20/18, at 8. He also testified that the victim was in a "messed up situation" in which his child's mother prevented him from seeing his child. ***Id***. at 12-13. Therefore, while Appellant did not explain what the "something" was and did not explicitly say that the D.C. court system had become involved in the "messed up situation," his testimony suggests awareness that the victim had a history with law enforcement in D.C. Consequently, his failure to question or investigate this known source of information, until after the trial concluded, was the real reason that this information, which he later acquired on his own, was unavailable to him at trial. Accordingly, Appellant has also failed to demonstrate that he was unaware of the information pretrial or that it was

not equally available to the defense and prosecution, and this claim lacks merit.

Regarding the photograph displaying Appellant's injuries, the Commonwealth asserts, and Appellant concedes, that the photograph allegedly withheld from the defense was published in the newspaper shortly after his arrest. *See* Appellant's brief at 35; Commonwealth's brief at 22; Appellant's reply brief at 10. Appellant's concession that there was an obvious, available source whereby he could have acquired this photograph pretrial, renders his *Brady* claim meritless. The purpose of *Brady* is to ensure that defendants have access to exculpatory evidence known only to the government. Therefore, it necessarily follows that no *Brady* violation occurs if the evidence in question is available to the defense from non-governmental sources such as a public newspaper. *Paddy*, *supra* at 305. Publication of the allegedly exculpatory photograph in the local newspaper negated any possibility that such evidence was suppressed by the prosecution.[2] For these reasons, both of his *Brady* claims fail.

_____

[2] Even if the photograph was not published in the newspaper, Appellant would not be entitled to any relief. While the jury may not have viewed this exact photo, it did hear from Appellant about his injuries, saw remarkably similar photographs of Appellant's face which depicted the same minor bruising as the photograph at issue, and watched a video which depicted a police photographer taking photographs of Appellant's injuries at the time that he gave his statement. See Commonwealth's brief at 23-24. Thus, Appellant has not shown that there is a reasonable probability that, had the photograph been shown to the jury at trial, the result of the proceeding would have been different.

In his second issue, Appellant attacks the Commonwealth's admission of a photograph depicting the cover of a knife catalogue as unfairly prejudicial. However, a review of the trial transcript reveals that the defense did not contemporaneously object to the admission of this photograph at trial. While initially trial counsel objected to the admission of the photograph as a violation of discovery rules, when it was brought to his attention that he did receive this photograph in discovery, counsel withdrew his objection. *See* N.T. Jury Trial, 6/20/18, at 76. Therefore, Appellant did not preserve this issue for appellate review and we are barred from considering it. *See Commonwealth v. Bruce*, 916 A.2d 657, 671 (Pa.Super. 2007) (holding that a "failure to offer a timely and specific objection results in waiver of" the claim).

In his third issue, Appellant claims that the trial court erred when it curtailed his testimony about his reasons for fearing the victim. *See* Appellant's brief at 45. Without explaining what information he was barred from revealing to the jury, Appellant cites to sections of his direct examination, which we have reproduced below:

Q.     Remember, [Appellant], we weren't there. So you have to take us through.

A.     Well, we were walking one day. I believe it was maybe a week after I came there and he started like really bashing on women. And I'm just thinking to myself like, okay, your mother's a woman, your sister's a woman. You are a father to a young woman, you know. What's your problem with women?

Q.     Did you say that to him, or is that what you were thinking?

A.     Well, I was thinking that at first.  And then I – like a little bit later on I came to him and I asked him why he doesn't have a girlfriend, and he said something to –

[Prosecutor]:  Objection to whatever [victim] said.

[Defense counsel]:  It goes to the *res gestae* of their relationship.

The Court:  Let me see you for a second.

. . . .

Q.     [Appellant] did you have any altercations or arguments with [victim] before February 18th?

A.     I don't know if this would count as an argument, but one day I got a text, and I was kind of upset about the text because I had missed it.  It was my daughter who texted me and I was just, you know, saying something to myself, you know what I mean?  Like I wish I could see my daughter, or something.  He was like –

[Prosecutor]:  Objection[.]

[Defense counsel]:  He's answering my question, was there an altercation.

The Court:  Did he or did he not?  Hold on for a second, ladies and gentlemen.  Let me see the three of you.

. . . .

Q.     Okay.  There were squabbles, right?  Nonsense roommate stuff, right?

A.     I wouldn't call threatening the life of the mother of my children a squabble.

[Prosecutor]:  Objection, Your Honor, to the non[-]responsive nature of [Appellant's] answer to that question.

The Court:  Objection sustained.

N.T. Jury Trial, 6/20/18, at 13-16, 35-36. The trial court later reversed its ruling and re-read Appellant's response of "I wouldn't call threatening the life of the mother of my children a squabble" to the jury. *Id*. at 98-99.

Generally, in reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. *Commonwealth v. Hunzer*, 868 A.2d 498, 510 (Pa.Super. 2005). "Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and [a reviewing court] will not reverse the court's decision on such a question absence a clear abuse of discretion." *Commonwealth v. Chmiel*, 738 A.2d 406, 414 (Pa. 1999). An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice manifest unreasonableness, or misapplication of law. *Commonwealth v. Cox*, 115 A.3d 333, 336 (Pa.Super. 2015). Additionally, we may affirm the trial court's ruling on any basis supported by the record. *Commonwealth v. Johnson*, 160 A.3d 127, 144 (Pa. 2017).

The trial court found that Appellant's claim was meritless since it only limited testimony that was unresponsive to trial counsel's questions and allowed Appellant to testify about the victim's history of violent behavior and violent comments. *See* Trial Court Opinion, 1/23/19, at 9. Additionally, the trial court points out that it reversed one of the rulings, allowing the jury to consider Appellant's statement that "I wouldn't call threatening the life of the mother of my children a squabble." *Id*.; *See also* N.T. Jury Trial, 6/20/18,

at 98-99. The Commonwealth agrees with the trial court's assessment and further counters that Appellant's claim is insufficiently developed, since he has never proffered what testimony he was allegedly barred from giving the jury. Commonwealth's brief at 35. Thus, any attempt by an appellate court to assess the substance of this claim is speculative. *Id*.

We agree with the Commonwealth's assessment that Appellant has failed to proffer what evidence he was excluded from sharing with the jury. Further, a review of the trial transcript supports the trial court's finding that Appellant did testify at length about the victim's alleged violent behavior and comments over the course of their relationship. *See* Trial Court Opinion, 1/23/19, at 9. Prior to the night of the homicide, Appellant testified about how the victim had repeatedly insulted him by asserting that Appellant needed to get a job, claiming Appellant "was not good enough for his sister," making a "dig" at Appellant's mother, threatening the life of his daughter's mother, locking him out of the house, and violently bursting through Appellant's bedroom door in order to demand that Appellant do the dishes. N.T. Jury Trial, 6/20/18, at 12, 17, 23, 25, 36. Based on these facts, the victim's larger stature, his prior military experience, and "other things I know about him," Appellant explained why he felt afraid of the victim. *Id*. at 12, 17-19, 40.

Appellant told the jury that on the night of the homicide, the victim initiated the fight, attacking him first. *Id*. at 19-20. Appellant explained the following. He had been outside smoking a cigarette when the victim

reportedly "yanked" him back inside the house, demanding "what I tell you about the F'n dishes?" *Id*. at 19. The victim then aggressively snatched cigarettes from Appellant's hand, before he started "slamming" Appellant against the microwave. *Id*. Appellant "ate his punches," before attempting to flee the house. *Id*. at 28, 58. However, the victim impeded his flight by grabbing him from behind, and placing him into a "guillotine chokehold." *Id*. at 28, 58-59, 62-63. At this point, Appellant feared the victim would break his neck and decided that his only option was to stab the victim twenty-one times to "get him to stop." *Id*. at 28.

The record demonstrates that Appellant was given the opportunity to substantiate his self-defense theory of the case with his own testimony by detailing all of the prior negative encounters that he had with the victim, in addition to his own perspective of what happened on the night in question. The jury, as it was entitled to do, chose to discredit it. Given the record before us, and no proffer from Appellant as to what testimony was excluded, we find that the trial court did not err when it found that Appellant was not entitled to any relief on this issue.

Fourth, Appellant alleges that the Commonwealth presented insufficient evidence to refute Appellant's justification defense to first-degree murder, when it failed to specify which of the twenty-one knife wounds incapacitated the victim. *See* Appellant's brief at 45-46. The Commonwealth responds that Appellant's claim is meritless, since the jury was not required to believe the

testimony of Appellant merely because he asserted self-defense. Also, the Commonwealth presented other evidence in addition to the large number of stab wounds which countered Appellant's defense. *See* Commonwealth's brief at 39-41. We disagree with Appellant's characterization of the medical examiner's testimony and find that the Commonwealth presented sufficient evidence to rebut Appellant's self-defense theory.

Our standard of review when considering a challenge to the sufficiency of the evidence is:

> Whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Gause*, 164 A.3d 532, 540-41 (Pa.Super. 2017) (citations and quotation marks omitted).

In order to prove that a person committed first-degree murder, the Commonwealth must establish that a human being has been unlawfully killed, that the accused killed him, and that the accused acted with the specific intent

to kill. 18 Pa.C.S. § 2501(a). Importantly, a fact-finder can infer a specific intent to kill from the use of a deadly weapon on a vital part of a victim's body. *Commonwealth v. Mitchell*, 902 A.2d 430, 440 (Pa. 2006).

When a defendant asserts self-defense, the Commonwealth bears the burden of disproving it. *Commonwealth v. Smith*, 97 A.3d 782, 787 (Pa.Super. 2014). The Commonwealth may discredit a self-defense theory by showing, *inter alia*, that a defendant's use of force exceeded the amount necessary to protect himself from serious bodily injury, the presence of defensive wounds on the victim's body, the absence of anything other than minor injuries to the defendant, and by discrediting the defendant's version of events. *Commonwealth v. Truong*, 36 A.3d 592, 599-60 (Pa.Super. 2012) (*en banc*) (concluding that evidence was sufficient to disprove self-defense where the defendant stabbed the victim nineteen times and did not sustain any major injuries); *see also Commonwealth v. Ward*, 188 A.3d 1301, 1305 (Pa.Super. 2018) (holding evidence was sufficient to disprove self-defense where defendant shot the victim in the head, made false statements to police about what happened, and attempted to hide physical evidence).

Here, the record establishes that the Commonwealth presented substantial physical and testimonial evidence, which, if the jury accepted it as true, would have defeated Appellant's self-defense theory. While the medical examiner could not testify to the precise order in which each wound was inflicted, he was able to opine that twelve of the twenty-one stab wounds that

the victim received were fatal, since they struck the victim's vital organs. N.T. Jury Trial, 6/19/18, at 147-48. These wounds, and in particular the one that struck the victim's superior vena cava, would have caused immediate massive blood loss such that the victim would have likely died within minutes of receiving it. *Id*. at 154-55. In addition, the victim sustained a deep stab wound to his lower back, which the medical examiner testified would have been difficult, if not impossible for Appellant to inflict while in a chokehold. *Id*. at 167, 169. Finally, the victim sustained extensive defensive wounds on the back of his arms, hands, wrists, palms, and fingers. *Id*. at 155-66. Appellant, however, suffered minor injuries to his hands consistent with wielding a knife, a busted lip, and bruises and scratches to his face. *Id*. at 125-27, 173-74. Importantly, there were no injuries visible on Appellant's neck. *Id*. at 127. When viewed in its entirety, the physical evidence alone was sufficient to refute Appellant's claims of self-defense.

Additionally, Kerrianne Perrish testified that Appellant had told her he had been in fights before and retaliated, that he had a number of hunting knives, and always carried one. *Id*. at 97, 102-03. Appellant sent a Facebook message to her at 1:46 a.m. on February 18th which stated "your brother just attacked me. I had enough." *Id*. at 85. When Ms. Perrish returned home at 2:34 a.m., Appellant was present, the victim was dead, the house was in complete disarray, and there was blood everywhere. *Id*. at 90, 95. Appellant

told Ms. Perrish that the victim had attacked him and then he left the premises. *Id*. at 90, 95.

When speaking with police, Appellant conceded that the victim was unarmed and that he did not care if the victim was alive or dead. N.T. Jury Trial, 6/20/18, at 84, 89. During his interview, he remarked that "the victim is gonna come across the wrong person one day and he is gonna get hurt if he keeps coming at people like that." *Id*. at 89. While alone in the interview room, Appellant opined out loud to himself that he had "told you to leave me the fuck alone, dude. . . . You been doing this shit to my ass since day fucking one." *Id*. at 89-90. The foregoing statement contradicted Appellant's trial testimony, as well as Ms. Perrish's testimony, that there had never been a physical altercation between Appellant and the victim prior to the February 18th incident. *Id*. at 39; N.T. Jury Trial, 6/19/18, at 81.

In sum, the Commonwealth introduced overwhelming evidence that refuted Appellant's claims of self-defense. Additionally, Appellant's own testimony was in conflict with the physical evidence. The Commonwealth met its burden of disproving Appellant's self-defense theory, and it proved, beyond a reasonable doubt, that Appellant committed first-degree murder.

Finally, Appellant appears to have asserted an after-discovered evidence claim in his reply brief. *See* Appellant's reply brief at 13. Specifically, Appellant alleges that the Commonwealth has recently turned over evidence that shows that a different judge in the Philadelphia Court of Common Pleas

concluded that the detective who took his taped statement committed misconduct in a different case when he "physically assaulted suspects, denied them food, and pulled them out of the hospital despite severe injuries." *Id*. Appellant argues that this information entitles him to a new trial since it would have supported his argument that inconsistencies existed between his trial testimony and taped statement because the police denied his requests for medical attention. *Id*. at 14. Appellant does not request a remand for an evidentiary hearing to explore this issue. Instead, he asks that we consider the detective's misconduct "in [our] materiality analysis" because it could have supported a suppression claim. *Id*. at 15. The Commonwealth counters that Appellant's vague request for us to consider this new evidence in some undefined way with regard to "materiality" is inappropriate. *See* Commonwealth's sur-reply brief at 5. We agree with the Commonwealth.

After-discovered evidence uncovered during the direct appeal process must be raised promptly and should include a request to remand to the trial judge. *See* Pa.R.Crim.P. 720(C). In order to obtain relief on a substantive after-discovered evidence claim, a petitioner must demonstrate that: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *Commonwealth v. Washington*, 927 A.2d 586 (Pa. 2007).

In addition to Appellant's improper request that we engage in a materiality analysis of an unpreserved suppression claim, Appellant has failed to request that we remand the case for an evidentiary hearing. However, even if he had included the proper request in his reply brief, remand would be unnecessary since Appellant's pleading is so deficient that it would not allow him to meet the threshold necessary to obtain an evidentiary hearing. In his reply brief, Appellant has not included the relevant standard that he must meet in order to obtain relief, nor has he structured his analysis accordingly.[3] Therefore, Appellant's failure to properly plead this claim necessitates waiver.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/20

---

[3] For example, while Appellant claims that this information would have enabled trial counsel to pursue a motion *in limine* to suppress his alleged coerced confession, he has failed to proffer how such a motion would have changed the outcome. Appellant's entire taped statement was played for the jury. Additionally, Appellant conceded that he never told detectives that he needed medical attention during the taped interview and Appellant expressly adopted his taped statement as an accurate summary of what happened. N.T. Jury Trial, 6/20/18, at 33, 48-49.