J-A11029-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY WILLIAM ZINCHINI | : | |
| | : | |
| Appellant | : | No. 1235 WDA 2020 |

Appeal from the Judgment of Sentence Entered June 18, 2020
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s):  CP-65-CR-0003003-2015

BEFORE:  McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY KING, J.:                    **FILED:  August 5, 2021**

Appellant, Jeffrey William Zinchini, appeals from the judgment of sentence entered in the Westmoreland County Court of Common Pleas, following his jury trial convictions for theft by unlawful taking, criminal mischief, and recklessly endangering another person ("REAP").[1]  We affirm.

In its opinion, the trial court sets forth the relevant facts of this case as follows:

> On November 5, 2012, employees of Peoples Gas went to the area of the Vandergrift Golf Course in order to close off an abandoned gas service line.  After starting to work on the line, they discovered that several valves were open and that natural gas was flowing through the line.  These valves could only be opened or closed by using a five-foot long specialty wrench.  Anyone with knowledge and the correct tools can open the valve.  The workers decided to dig further in an attempt to see whether there was another tap placed on the

---

[1] 18 Pa.C.S.A. §§ 3921(a); 3304(a)(2); and 2705.

line which allowed the active flow of gas. After digging, they discovered a manifold with Winfall's gas meter near the golf course maintenance building. Service to this line had been terminated by Peoples Gas on July 17, 2009, after the Vandergrift Golf Course chose Winfall Energy as its gas service provider. [Appellant] is the president and treasurer of Winfall Energy. At the time the service from Peoples Gas was terminated, the company removed its gas meter and shut off all valves, thereby terminating the flow of natural gas through the line. The service line was left in place for future use should the golf course want to restore Peoples Gas as its service provider.

About an hour after the workers began digging at the site with an excavator, [Appellant] appeared and questioned what the People Gas workers were doing. [Appellant] advised the Peoples Gas supervisor that, at his direction, his own workers had installed a three inch "T" in the Peoples Gas service line in order to connect a Winfall Energy line with the golf course maintenance building so that gas service could be provided to the golf course. [Appellant] testified that on January 3, 2012, a gas leak was detected at the golf course maintenance building. In an attempt to fix the leak and restore gas service to the golf course, [Appellant] testified that he built a T connector between his line and the Peoples Gas service line. According to the supervisor, [Appellant] said that he assumed that the Peoples line was dead and that it would be okay to tap into it. [Appellant] repeated this assertion in his testimony at trial. Representatives of the Vandergrift Golf Course testified that they were not billed by Winfall for work to fix the gas line to the maintenance building nor did they recall work being performed on that line.

The Winfall manifold was removed from the service line and capped at the direction of the supervisor from Peoples Gas. The next day, [Appellant] called the Peoples Gas supervisor and apologized for causing them inconvenience. In this telephone call, [Appellant] again said that he thought it was an abandoned service line and that he did not know that it was active or connected to Peoples Gas. According to a witness from Peoples Gas, a gas service line is considered to be active until it is capped and abandoned by the company. This had not been completed when Peoples Gas

- 2 -

terminated service to the golf course in 2009 although the meter and valves were locked and shut off.

The Peoples Gas workers also discovered that the line at the riser which was owned by Winfall Energy and located at the maintenance building had gas flowing at 11 pounds of pressure but the Peoples Gas line ran at 38 to 40 pounds of pressure. They also discovered that a pressure regulator had been placed on the Winfall manifold. This regulator reduced the pressure from the gas flowing in the service line to a lower pressure so that it could provide service to the inside of the maintenance building. The orientation of the regulator was to allow gas to flow from the service line into the Winfall lines at a reduced pressure. An expert presented by the defense agreed that the pressure regulator as it was installed in [Appellant]'s system reduced the flow of gas as it entered [Appellant]'s manifold from the service line. Additionally, a witness testified that he installed a Kimray suction pressure regulator on [Appellant]'s compressor at [Appellant]'s direction. According to the witness, the Kimray regulator would help to even out high pressure as it enters [Appellant]'s compressor. In his testimony, [Appellant] denied that he added a Kimray regulator to his compressor but acknowledged that he knew how to regulate pressures in the system so that higher pressure wells can be brought into his system.

Representatives from the Department of Environmental Protection ("DEP") and Gas Analytical Services testified that [Appellant]'s company submitted reports which reflected a substantially lower production from [Appellant]'s wells which contributed to the gas flow to the maintenance building [than] what was represented by [Appellant] The representative from the DEP further testified that Winfall Energy amended its production reports on September 22, 2014, to report productions numbers which were higher than those previously submitted. [Appellant] acknowledged in his testimony that these reports were not accurate. [Appellant] also acknowledged that he met with a detective from Westmoreland County on August 13, 2014.

One of the owners of a well which contributed to Winfall Energy's gas production who received royalties based on production numbers testified that she never received an

increase in her payments which would have been consistent with the increased production numbers reported by Winfall in its amended report to DEP. A representative from Peoples Gas testified that the difference between what was reported through production numbers and what was registered through Winfall's meter showing the amounts of gas delivered to the golf course totaled discrepancies ranging from $44,568.95 to over one million dollars.

An employee of Peoples Gas explained that the workers had been placed at risk of fire, explosion or asphyxiation because they had no prior notice that the gas line, which was supposed to be closed, had been activated. Gas leaks create a risk of explosion. [Appellant] acknowledged in his testimony that natural gas poses a safety threat. This risk was also acknowledged by the defense expert. [Appellant] further acknowledged that the purpose of PA One Call is to ensure safety of workers. A representative from PA One Call testified that no notifications of excavating activity were made by Winfall Energy until July 29, 2012.

(Trial Court Opinion, filed October 15, 2020, at 5-8) (internal record citations omitted).

On December 7, 2018, a jury convicted Appellant of theft, REAP, and criminal mischief. The court held a restitution hearing on December 12, 2019. On January 29, 2020, the court entered an order indicating that it would impose restitution in the amount of $2,000.00 at sentencing. On June 18, 2020, the court sentenced Appellant to 3 years' intensive supervision with 1 year of home electronic monitoring and a $5,000.00 fine for theft; 2 years' consecutive probation for REAP; and no further penalty for criminal mischief.[2]

---

[2] The court vacated the restitution award on June 18, 2020, concluding that Peoples Gas did not meet the definition of a "victim" under the version of 18 Pa.C.S.A. § 1106 in effect at the relevant time.

On that same day, Appellant timely filed a post-sentence motion. The court denied the motion on October 15, 2020. Appellant timely filed a notice of appeal on November 9, 2020. The court did not order, and Appellant did not file, a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review:

> Where the jury has found that the theft has a value of "between $2,000 and $100,000," but the jury's finding does not comport with any felony-theft crime and the state has presented no evidence as to value, must the conviction be vacated?
>
> Where the jury has found that the theft has a value of "between $2,000 and $100,000," even though this value does not comport with any felony-theft crime, the value of the theft cannot be set at $50.00 but must be set at the erroneous value chosen by the jury.
>
> Where the jury finds that the theft has a value of "between $2,000 and $100,000," but the state has presented no evidence as to value, the conviction must be vacated[.]
>
> With respect to the conviction of reckless endangerment, can there be a conviction in the absence of findings or evidence that there was a *mens rea* and that the danger created surpassed the normal danger of everyday life?

(Appellant's Brief at 6).

For purposes of disposition, we combine Appellant's first two issues. Appellant argues that the verdict slip incorrectly allowed the jury to determine the value of the theft as "**between** $2,000 and $100,000," instead of using the statutory language of "**exceeds** $2,000." Appellant claims that under 18 Pa.C.S.A. § 3903 the grading of theft as a felony of the third degree requires

- 5 -

the value of the stolen item to exceed $2,000. Appellant claims that due to the wording on the verdict slip, the jury only found that the theft was "between $2,000 and $100,000," which is not the same as finding that the value of the theft "exceeds $2,000." Appellant reasons that the inaccurate verdict slip may have resulted in the jury finding that the maximum value of the theft was only $2,000, which is not an amount that exceeds $2,000. Appellant concludes that the verdict slip was incorrect, so his theft conviction should not have been graded as a felony of the third degree, and it must be vacated. We disagree.

As a preliminary matter, we observe the general rule that "the failure to object to an improper verdict slip before deliberations also waives any complaint relating thereto." *Commonwealth v. Dorm*, 971 A.2d 1284, 1288 (Pa.Super. 2009) (citation omitted). *See also Commonwealth v. Matty*, 619 A.2d 1383, 1387 (Pa.Super. 1993) (explaining defendant's "failure to contemporaneously object to jury instructions or verdict slip… operates as waiver"). Nevertheless, "[a] claim that the court improperly graded an offense for sentencing purposes implicates the legality of a sentence[,]" which is non-waivable, assuming jurisdiction is proper. *Commonwealth v. Hoffman*, 198 A.3d 1112, 1123 (Pa.Super. 2018); *Commonwealth v. Berry*, 877 A.2d 479, 482 (Pa.Super. 2005) (explaining court may entertain challenge to legality of sentence so long as court has jurisdiction to hear claim).

Instantly, Appellant did not object to the verdict slip at trial. (*See* N.T. Trial, 12/7/18, at 718). Consequently, any objection to the language used on

the verdict slip would ordinarily be waived on appeal. *See Dorm, supra*; *Matty, supra*. Nevertheless, Appellant's claims that the wording on the verdict slip resulted in improper grading of his theft offense implicate the legality of his sentence. As such, we will address Appellant's grading challenge. *See Hoffman, supra*; *Berry, supra*.

When examining a challenge to the legality of a sentence, our scope and standard of review are as follows:

> A claim that implicates the fundamental legal authority of the court to impose a particular sentence constitutes a challenge to the legality of the sentence. *Commonwealth v. Robinson,* 931 A.2d 15, 21 (Pa.Super. 2007) (*en banc*); *Commonwealth v. Randal*, 837 A.2d 1211 (Pa.Super. 2003) (*en banc*). "If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated." *Commonwealth v. Watson*, 945 A.2d 174, 178-79 (Pa.Super. 2008) (quoting *Commonwealth v. Leverette*, 911 A.2d 998, 1001-02 (Pa.Super. 2006)). When the legality of a sentence is at issue on appeal, our "standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Diamond*, 945 A.2d 252, 256 (Pa.Super. 2008), *appeal denied*, 598 Pa. 755, 955 A.2d 356 (2008).

*Commonwealth v. Catt*, 994 A.2d 1158, 1160 (Pa.Super. 2010) (*en banc*).

The Pennsylvania Crimes Code defines theft by unlawful taking or disposition in relevant part as follows:

### § 3921. Theft by unlawful taking or disposition

**(a) Movable property**.—A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

- 7 -

\*    \*    \*

18 Pa.C.S.A § 3921(a). The Crimes Code defines "movable property" as:

> Property the location of which can be changed, including things growing on, affixed to, or found in land, and documents although the rights represented thereby have no physical location. "Immovable property" is all other property.

18 Pa.C.S.A. § 3901. "Deprivation" occurs if a person: (1) "withhold[s] property of another permanently;" or (2) "dispose[s] of the property so as to make it unlikely that the owner will recover it." ***Id.***

The value of the stolen property determines the classification of the theft offense. ***Commonwealth v. Figueroa***, 859 A.2d 793 (Pa.Super. 2004). Consequently, the burden to establish the value of the stolen property is upon the Commonwealth. ***Commonwealth v. Hanes***, 522 A.2d 622 (Pa.Super. 1987).

The Crimes Code further sets forth the grading scheme for theft offenses as follows:

**§ 3903. Grading of theft offenses**

**(a) Felony of the second degree**.—Theft constitutes a felony of the second degree if:

(1) The offense is committed during a manmade disaster, a natural disaster or a war-caused disaster and constitutes a violation of section 3921 (relating to theft by unlawful taking or disposition), 3925 (relating to receiving stolen property), 3928 (relating to unauthorized use of automobiles and other vehicles) or 3929 (relating to retail theft).

(2) The property stolen is a firearm.

(3)    In the case of theft by receiving stolen property, the property received, retained or disposed of is a firearm.

(4)    The property stolen is any amount of anhydrous ammonia.

(5)    The amount involved is $100,000 or more but less than $500,000.

**(a.1) Felony of the third degree**.—Except as provided in subsection (a) or (a.2), theft constitutes a felony of the third degree if the amount involved **exceeds $2,000**, or if the property stolen is an automobile, airplane, motorcycle, motorboat or other motor-propelled vehicle, or in the case of theft by receiving stolen property, if the receiver is in the business of buying or selling stolen property.

**(a.2) Felony of the first degree**.—Except as provided in subsections (a) and (a.1), theft constitutes a felony of the first degree if:

(1)    in the case of theft by receiving stolen property, the property received, retained or disposed of is a firearm and the receiver is in the business of buying or selling stolen property; or

(2)    the amount involved is $500,000 or more.

**(b)    Other grades**.—Theft not within subsection (a), (a.1) or (a.2), constitutes a misdemeanor of the first degree, except that if the property was not taken from the person or by threat, or in breach of fiduciary obligation, and:

(1)    the amount involved was $50 or more but less than $200 the offense constitutes a misdemeanor of the second degree; or

(2)    the amount involved was less than $50 the offense constitutes a misdemeanor of the third degree.

*    *    *

18 Pa.C.S.A § 3903(a), (a.1), (a.2), (b) (emphasis added).

Thus, a theft constitutes a felony of the third degree if the amount involved exceeds $2,000. **See** 18 Pa.S.C.A. § 3903(a.1). "The Commonwealth is not required to establish the precise market value of the stolen property. Rather the Commonwealth must present evidence from which a reasonable jury may conclude that the market value was at least a certain amount." **Hanes, supra** at 625.

Importantly, "the verdict slip exists to record the result of the jury's deliberation; it is not the deliberation itself, and the jury's deliberation is guided by the court's charge." **Commonwealth v. Ali**, 608 Pa. 71, 119, 10 A.3d 282, 311 (2010). **See also Commonwealth v. Johnson**, 572 Pa. 283, 318, 815 A.2d 563, 584 (2002) (explaining that, unlike instructions containing "an articulation of points of law" or legal definitions, trial court merely instructing jury how to fill out verdict slip, is not construed as prejudicial).

Instantly, the court instructed the jury as follows:

> Elements Affecting the Grading of Theft Offenses: Grading, if you find [Appellant] guilty of the theft on the basis of the instructions I have just given you, then it will be necessary for you to make a further determination regarding the value of the stolen natural gas.
>
> First, you should consider whether the Commonwealth established beyond a reasonable doubt that the value of the stolen natural gas is one of the following: $100,000 or more; **more than $2,000**, but less than $100,000; more than $200, but less than $2,000; more than $50, but less than $200; or less than $50.

(N.T. Trial at 18-19) (emphasis added).

Here, Appellant takes issue with the verdict slip indicating the jury

needed to find the theft was **between** $2,000 and $100,000, instead of expressly stating that the theft needed to **exceed** $2,000. Nevertheless, the court made clear in its instruction that the jury had to find the Commonwealth established beyond a reasonable doubt that the value of the stolen natural gas was "more than $2,000, but less than $100,000." ***See id.*** Under these circumstances, the court's jury instruction cured any deficiency in the verdict slip, and we see no error with the court's grading of Appellant's theft offense as a third-degree felony. ***See Ali, supra***; ***Johnson, supra***.

In his third issue, Appellant argues the Commonwealth failed to provide any evidence regarding the value of the theft. Appellant claims that the Commonwealth improperly speculated as to the value of the item taken. Appellant concludes the Commonwealth presented insufficient evidence to sustain his theft conviction in the absence of any evidence establishing the value of what was stolen. We disagree.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of

fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Jackson*, 215 A.3d 972, 980 (Pa.Super. 2019) (quoting

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal*

*denied*, 613 Pa. 642, 32 A.3d 1275 (2011)).

Instantly, the court analyzed the sufficiency claim for theft by unlawful

taking as follows:

[Appellant] initiated the tap-in of his gas line to the service line connected with the Peoples Gas system. On his own, [Appellant] created the T configuration which allowed natural gas from the Peoples Gas system to continue flowing through the line rather than creating a U or elbow configuration which would have diverted his own gas into the service line but blocked any gas coming from Peoples Gas.

\* \* \*

The records of discrepancies in the reported totals of gas produced by the wells compared with the amounts registered in [Appellant]'s meter provide sufficient basis to value the amount stolen as determined by the factfinder in this case. Finally, it cannot be denied that [Appellant] and only [Appellant] benefitted from tapping into Peoples Gas and re-directing its natural gas into his system to supply the golf course.

The Commonwealth's evidence establishes [Appellant]'s motive for committing a theft of gas, [Appellant]'s expertise in effectuating the necessary technical accommodations to commit the crime, [Appellant]'s access to the tools and

- 12 -

mechanisms required to undertake a theft, and his ability and opportunity to carry out the theft. Circumstantially, the evidence allows for the conclusion that when he went out to investigate a gas leak at the maintenance building in January 2012, [Appellant] saw an avenue to steal gas from Peoples Gas and took it.

(Trial Court Opinion at 8-10). The record supports the court's analysis.

Specifically, our review of the record shows that in 2013, the actual amount of gas Appellant sold was 13,966 million cubic feet ("MCF"), yet he only reported selling 363 MCF to DEP. (*See* N.T. Trial at 336-37). Jeffrey Scott Nehr, the Vice-President at Peoples Gas explained that this discrepancy meant that Appellant sold more gas than his records indicated he produced. (*Id.* at 347). This extra gas was valued at $44,568.93. (*Id.*) In other words, Appellant under-reported his actual sales of gas because he was not producing that additional gas. Instead, he was stealing it. Thus, the record establishes that Appellant's theft of gas allowed him to steal more than $2,000. Viewed in the light most favorable to the Commonwealth as verdict-winner, the Commonwealth presented sufficient evidence to sustain Appellant's conviction for theft by unlawful taking. *See* 18 Pa.C.S.A § 3921(a); *Jackson, supra*.

In his fourth issue, Appellant argues the Commonwealth failed to establish the requisite *mens rea* to sustain his REAP conviction. Appellant alleges that the evidence failed to establish that he acted with malice. Appellant claims that he did not bear anyone a grudge, nor did he have any reason to injure anyone. Appellant concludes the Commonwealth presented insufficient evidence to sustain his conviction for REAP, and this Court should

reverse his conviction and vacate his sentence. We disagree.

The Crimes Code defines REAP in relevant part as follows:

### § 2705.  Recklessly endangering another person

A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A § 2705.

Thus, the crime requires (1) a *mens rea* of recklessness, (2) an *actus reus* [of] some "conduct," (3) causation "which places," and (4) the achievement of a particular result "danger," to another person, of death or serious bodily injury.

***Commonwealth v. Reynolds***, 835 A.2d 720, 727 (Pa.Super. 2003) (quoting

***Commonwealth v. Trowbridge***, 395 A.2d 1337, 1340 (Pa.Super. 1978)).

The *mens rea* required for REAP is "a conscious disregard of a known risk of death or great bodily harm to another person." ***Commonwealth v. Klein***, 795 A.2d 424, 427-28 (Pa.Super. 2002) (citation omitted). "Serious bodily injury" is "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. Significantly, REAP "is a crime of assault which requires the creation of danger" so "there must be an actual present ability to inflict harm." ***Reynolds, supra*** at 727-28. Mere apparent ability is not enough because danger, and not the apprehension of danger, must be created. ***Id.*** at 728 (quoting ***Trowbridge, supra***). What constitutes sufficient evidence for a

REAP conviction depends on the facts and circumstances of the individual case. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa.Super. 2009).

Instantly, the court analyzed the sufficiency claim for REAP as follows:

> With regard to Count 3, [REAP], the evidence clearly shows that [Appellant] appreciated that there was a serious and substantial risk of death or serious bodily injury should there be a leak of natural gas or should workers mishandle an active gas line. Additionally, the evidence established that the workers from Peoples Gas were placed in danger of death or serious bodily injury when, as a result of [Appellant's] conduct, they worked on, dug up, and excavated a gas line under the impression that it had been closed off but which, in fact, was active with flowing natural gas. The only question is whether the identifiable risk to the Peoples Gas employees should have been recognized by [Appellant] at the time he reactivated the natural gas service line and whether [Appellant] disregarded this risk. A reasonable factfinder could well have concluded, based on the evidence, that [Appellant] had experience in the field of natural gas, had an appreciation of the substantial risks posed to anyone who would have been called to work on the service line or in the area of the service line without knowledge that it had been reactivated with gas, and disregarded those risks in pursuit of a plan to steal gas.

(Trial Court Opinion at 10-11). The record supports the court's analysis.

Specifically, our review of the record shows that John Znackzko, a construction supervisor for Peoples Gas, explained the risks created by Appellant's action of stealing gas. Mr. Znackzko testified that a worker could suffer from asphyxiation, or an explosion, or a fire could have occurred. (**See** N.T. Trial at 181-82). The evidence showed that Appellant consciously disregarded a known risk of death or great bodily harm to another person. **See Klein, supra**. Viewed in the light most favorable to the Commonwealth

as verdict-winner, the evidence was sufficient to convict Appellant of REAP.

**See Jackson, supra**.  Accordingly, we affirm.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/5/2021